## AMERICAN COMMUNICATIONS ASSN., C. I. O., ET AL. *v.* DOUDS, REGIONAL DIRECTOR OF THE NATIONAL LABOR RELATIONS BOARD.

NO. 10.

Argued October 10–11, 1949.—Decided May 8, 1950.

*Victor Rabinowitz* argued the cause for appellants in No. 10. With him on the brief was *Leonard B. Boudin. Samuel A. Neuburger* was also of counsel.

*Thomas E. Harris* argued the cause for petitioners in No. 13. With him on the brief were *Arthur J. Goldberg* and *Frank Donner.*

*Solicitor General Perlman* argued the cause for appellee in No. 10 and respondent in No. 13. With him on the briefs were *Robert L. Stern, Stanley M. Silverberg, Robert N. Denham, David P. Findling, A. Norman Somers, Mozart G. Ratner* and *Norton J. Come.*

Briefs of *amici curiae* supporting appellants in No. 10 were filed by *Arthur J. Goldberg, Frank Donner* and *Thomas E. Harris* for the Congress of Industrial Organizations; and *Osmond K. Fraenkel* and *Jerome Walsh* for the American Civil Liberties Union.

Briefs of *amici curiae* supporting appellants in No. 10 and petitioners in No. 13 were filed by *Robert W. Kenny, Robert J. Silberstein, Richard F. Watt* and *Edmund Hatfield* for the National Lawyers' Guild; and *Allan R. Rosenberg* for the United Electrical, Radio & Machine Workers (C. I. O.).

MR. CHIEF JUSTICE VINSON delivered the opinion of the Court.

These cases present for decision the constitutionality of § 9 (h) of the National Labor Relations Act, as amended by the Labor Management Relations Act, 1947.[1] This section, commonly referred to as the non-Communist affidavit provision, reads as follows: "No investigation shall be made by the [National Labor Relations] Board of any question affecting commerce concerning the representation of employees, raised by a labor organization under subsection (c) of this section, no petition under section 9 (e) (1) shall be entertained, and no complaint shall be issued pursuant to a charge made by a labor organization under subsection (b) of section 10, unless there is on file with the Board an affidavit executed contemporaneously or within the preceding twelve-month period by each officer of such labor organization and the officers of any national or international labor organization of which it is an affiliate or

---

[1] 61 Stat. 136, 146, 29 U. S. C. (Supp. III) § 141, § 159 (h), amending the National Labor Relations Act of 1935, 49 Stat. 449, 29 U. S. C. § 151 *et seq.*

constituent unit that he is not a member of the Communist Party or affiliated with such party, and that he does not believe in, and is not a member of or supports any organization that believes in or teaches, the overthrow of the United States Government by force or by any illegal or unconstitutional methods. The provisions of section 35 A of the Criminal Code shall be applicable in respect to such affidavits."

In No. 10, the constitutional issue was raised by a suit to restrain the Board from holding a representation election in a bargaining unit in which appellant union was the employee representative, without permitting its name to appear on the ballot, and, should the election be held, to restrain the Board from announcing the results or certifying the victor, until a hearing was granted to appellant. A hearing had been denied because of the noncompliance with § 9 (h). The complaint alleged that this requirement was unconstitutional. Appellee's motion to dismiss the complaint was granted by the statutory three-judge court, 79 F. Supp. 563 (1948), with one judge dissenting. Since the constitutional issues were properly raised and substantial, we noted probable jurisdiction.

No. 13 is the outcome of an unfair labor practice complaint filed with the Board by petitioner unions. The Board found that Inland Steel Company had violated the Labor Relations Act in refusing to bargain on the subject of pensions. 77 N. L. R. B. 1 (1948). But the Board postponed the effective date of its order compelling the company to bargain, pending the unions' compliance with § 9 (h). Both sides appealed: the company urged that the Act had been misinterpreted; the unions contended that § 9 (h) was unconstitutional and therefore an invalid condition of a Board order. When the court below upheld the Board on both counts, 170 F. 2d 247 (1948), with one judge dissenting as to § 9 (h), both sides filed petitions for certiorari. We denied the petition pertain-

ing to the pension issue, 336 U. S. 960 (1949), but granted the petition directed at the affidavit requirement, 335 U. S. 910 (1949), because of the manifest importance of the constitutional issues involved.

## I.

The constitutional justification for the National Labor Relations Act was the power of Congress to protect interstate commerce by removing obstructions to the free flow of commerce. *National Labor Relations Board* v. *Jones & Laughlin Steel Corp.*, 301 U. S. 1 (1937). That Act was designed to remove obstructions caused by strikes and other forms of industrial unrest, which Congress found were attributable to the inequality of bargaining power between unorganized employees and their employers. It did so by strengthening employee groups, by restraining certain employer practices, and by encouraging the processes of collective bargaining.

When the Labor Management Relations Act was passed twelve years later, it was the view of Congress that additional impediments to the free flow of commerce made amendment of the original Act desirable. It was stated in the findings and declaration of policy that:

> "Experience has further demonstrated that certain practices by some labor organizations, their officers, and members have the intent or the necessary effect of burdening or obstructing commerce by preventing the free flow of goods in such commerce through strikes and other forms of industrial unrest or through concerted activities which impair the interest of the public in the free flow of such commerce. The elimination of such practices is a necessary condition to the assurance of the rights herein guaranteed." [2]

---

[2] 29 U. S. C. (Supp. III) § 151.

One such obstruction, which it was the purpose of § 9 (h) of the Act to remove, was the so-called "political strike." Substantial amounts of evidence were presented to various committees of Congress, including the committees immediately concerned with labor legislation, that Communist leaders of labor unions had in the past and would continue in the future to subordinate legitimate trade union objectives to obstructive strikes when dictated by Party leaders, often in support of the policies of a foreign government. And other evidence supports the view that some union leaders who hold to a belief in violent overthrow of the Government for reasons other than loyalty to the Communist Party likewise regard strikes and other forms of direct action designed to serve ultimate revolutionary goals as the primary objectives of labor unions which they control.[3] At the committee hearings, the incident most fully developed was a strike at the Milwaukee plant of the Allis-Chalmers Manufacturing Company in 1941, when that plant was producing vital materials for the national defense program. A full hearing was given not only to company officials, but also to leaders of the international and local unions involved. Congress heard testimony that the strike had been called solely in obedience to Party orders for the purpose of starting the "snowballing of strikes" in defense plants.[4]

No useful purpose would be served by setting out at length the evidence before Congress relating to the prob-

---

[3] A detailed description of the aims and tactics of the Socialist Workers Party, for example, may be found in the transcript of record in *Dunne* v. *United States*, 320 U. S. 790 (1943), certiorari denied. We cite the record as evidence only and express no opinion whatever on the merits of the case. See record, pp. 267–271, 273–274, 330–332, 439, 475, 491–492, 495–496, 535, 606, 683–688, 693, 737, 804–805.

[4] See Hearings before House Committee on Education and Labor on Bills to Amend and Repeal the National Labor Relations Act, 80th Cong., 1st Sess. 3611–3615.

lem of political strikes, nor can we attempt to assess the validity of each item of evidence. It is sufficient to say that Congress had a great mass of material before it which tended to show that Communists and others proscribed by the statute had infiltrated union organizations not to support and further trade union objectives, including the advocacy of change by democratic methods, but to make them a device by which commerce and industry might be disrupted when the dictates of political policy required such action.

## II.

The unions contend that the necessary effect of § 9 (h) is to make it impossible for persons who cannot sign the oath to be officers of labor unions. They urge that such a statute violates fundamental rights guaranteed by the First Amendment: the right of union officers to hold what political views they choose and to associate with what political groups they will, and the right of unions to choose their officers without interference from government.[5] The Board has argued, on the other hand, that § 9 (h) presents no First Amendment problem because its sole sanction is the withdrawal from noncomplying unions of the "privilege" of using its facilities.

Neither contention states the problem with complete accuracy. It cannot be denied that the practical effect of denial of access to the Board and the denial of a place on the ballot in representation proceedings is not merely to withhold benefits granted by the Government but to impose upon noncomplying unions a number of restrictions which would not exist if the Board had not been

---

[5] The First Amendment provides: "Congress shall make no law . . . abridging the freedom of speech, or of the press; or the right of the people peaceably to assemble, and to petition the Government for a redress of grievances."

established.[6]   The statute does not, however, specifically
forbid persons who do not sign the affidavit from holding
positions of union leadership nor require their discharge
from office.   The fact is that § 9 (h) may well make it dif-
ficult for unions to remain effective if their officers do not
sign the affidavits.   How difficult depends upon the cir-
cumstances of the industry, the strength of the union and
its organizational discipline.   We are, therefore, neither
free to treat § 9 (h) as if it merely withdraws a privilege
gratuitously granted by the Government, nor able to con-
sider it a licensing statute prohibiting those persons who
do not sign the affidavit from holding union office.   The
practicalities of the situation place the proscriptions of
§ 9 (h) somewhere between those two extremes.   The
difficult question that emerges is whether, consistently
with the First Amendment, Congress, by statute, may
exert these pressures upon labor unions to deny positions
of leadership to certain persons who are identified by
particular beliefs and political affiliations.

## III.

There can be no doubt that Congress may, under its
constitutional power to regulate commerce among the
several States, attempt to prevent political strikes and
other kinds of direct action designed to burden and inter-
rupt the free flow of commerce.   We think it is clear, in
addition, that the remedy provided by § 9 (h) bears rea-

---

[6] For example, a union whose officers do not file an affidavit in
compliance with § 9 (h) may not enter into a union shop contract
with an employer, as it was free to do before passage of the National
Labor Relations Act.   A noncomplying union is excluded from the
ballot in representation proceedings.   If another union is certified,
the noncomplying union incurs the disabilities of §§ 8 (b) (4) (C)
and 303 (a) (3), as it would not have done prior to 1935.   Similarly,
certain strikes and boycotts are prohibited to noncomplying unions
by §§ 8 (b) (4) (B), 8 (b) (4) (C) and 8 (b) (4) (D) of the Act.

sonable relation to the evil which the statute was designed to reach. Congress could rationally find that the Communist Party is not like other political parties in its utilization of positions of union leadership as means by which to bring about strikes and other obstructions of commerce for purposes of political advantage, and that many persons who believe in overthrow of the Government by force and violence are also likely to resort to such tactics when, as officers, they formulate union policy.

The fact that the statute identifies persons by their political affiliations and beliefs, which are circumstances ordinarily irrelevant to permissible subjects of government action, does not lead to the conclusion that such circumstances are never relevant. *In re Summers,* 325 U. S. 561 (1945); *Hamilton* v. *Regents,* 293 U. S. 245 (1934). We have held that aliens may be barred from certain occupations because of a reasonable relation between that classification and the apprehended evil, *Clarke* v. *Deckebach,* 274 U. S. 392 (1927); *Pearl Assurance Co.* v. *Harrington,* 313 U. S. 549 (1941), even though the Constitution forbids arbitrary banning of aliens from the pursuit of lawful occupations. *Truax* v. *Raich,* 239 U. S. 33 (1915); *Takahashi* v. *Fish and Game Commission,* 334 U. S. 410 (1948). Even distinctions based solely on ancestry, which we declared "are by their very nature odious to a free people," have been upheld under the unusual circumstances of wartime. *Hirabayashi* v. *United States,* 320 U. S. 81 (1943).[7] If accidents of birth and ancestry under some circumstances justify an inference concerning future conduct, it can hardly be doubted that voluntary affiliations and beliefs justify a similar inference when drawn by the legislature on the basis of its investigations.

---

[7] See also *Luria* v. *United States,* 231 U. S. 9 (1913); *Mackenzie* v. *Hare,* 239 U. S. 299 (1915); *Lapides* v. *Clark,* 85 U. S. App. D. C. 101, 176 F. 2d 619 (1949).

This principle may be illustrated by reference to statutes denying positions of public importance to groups of persons identified by their business affiliations. One federal statute,[8] for example, provides that no partner or employee of a firm primarily engaged in underwriting securities may be a director of a national bank. This Court noted that the statute is directed "to the probability or likelihood, based on the experience of the 1920's, that a bank director interested in the underwriting business may use his influence in the bank to involve it or its customers in securities which his underwriting house has in its portfolio or has committed itself to take." *Board of Governors* v. *Agnew,* 329 U. S. 441, 447 (1947). It was designed "to remove tempting opportunities from the management and personnel of member banks." *Id.* at p. 449. There was no showing, nor was one required, that all employees of underwriting firms would engage in such conduct. Because of their business connections, carrying as they do certain loyalties, interests and disciplines, those persons were thought to pose a continuing threat of participation in the harmful activities described above. Political affiliations of the kind here involved, no less than business affiliations, provide rational ground for the legislative judgment that those persons proscribed by § 9 (h) would be subject to "tempting opportunities" to commit acts deemed harmful to the national economy. In this respect, § 9 (h) is not unlike a host of other statutes which prohibit specified groups of persons from holding positions of power and public interest because, in the legislative judgment, they threaten to abuse the trust that is a necessary concomitant of the power of office.

If no more were involved than possible loss of position, the foregoing would dispose of the case. But the more

---

[8] Sections 30 and 32 of the Banking Act of 1933, 48 Stat. 162, 193, 194, as amended, 49 Stat. 684, 709, 12 U. S. C. §§ 77, 78.

difficult problem here arises because, in drawing lines on the basis of beliefs and political affiliations, though it may be granted that the proscriptions of the statute bear a reasonable relation to the apprehended evil, Congress has undeniably discouraged the lawful exercise of political freedoms as well. Stated otherwise, the problem is this: Communists, we may assume, carry on legitimate political activities. Beliefs are inviolate. *Cantwell* v. *Connecticut,* 310 U. S. 296, 303 (1940). Congress might reasonably find, however, that Communists, unlike members of other political parties, and persons who believe in overthrow of the Government by force, unlike persons of other beliefs, represent a continuing danger of disruptive political strikes when they hold positions of union leadership. By exerting pressures on unions to deny office to Communists and others identified therein, § 9 (h) undoubtedly lessens the threat to interstate commerce, but it has the further necessary effect of discouraging the exercise of political rights protected by the First Amendment. Men who hold union offices often have little choice but to renounce Communism or give up their offices. Unions which wish to do so are discouraged from electing Communists to office. To the grave and difficult problem thus presented we must now turn our attention.

IV.

The unions contend that once it is determined that this is a free speech case, the "clear and present danger" test must apply. See *Schenck* v. *United States,* 249 U. S. 47 (1919). But they disagree as to how it should be applied. Appellant in No. 10 would require that joining the Communist Party or the expression of belief in overthrow of the Government by force be shown to be a clear and present danger of some substantive evil, since those are the doctrines affected by the statute. Peti-

tioner in No. 13, on the other hand, would require a showing that political strikes, the substantive evil involved, are a clear and present danger to the security of the Nation or threaten widespread industrial unrest.

This confusion suggests that the attempt to apply the term, "clear and present danger," as a mechanical test in every case touching First Amendment freedoms, without regard to the context of its application, mistakes the form in which an idea was cast for the substance of the idea. The provisions of the Constitution, said Mr. Justice Holmes, "are not mathematical formulas having their essence in their form; they are organic living institutions transplanted from English soil. Their significance is vital not formal; it is to be gathered not simply by taking the words and a dictionary, but by considering their origin and the line of their growth." *Gompers* v. *United States,* 233 U. S. 604, 610 (1914). Still less should this Court's interpretations of the Constitution be reduced to the status of mathematical formulas. It is the considerations that gave birth to the phrase, "clear and present danger," not the phrase itself, that are vital in our decision of questions involving liberties protected by the First Amendment.

Although the First Amendment provides that Congress shall make no law abridging the freedom of speech, press or assembly, it has long been established that those freedoms themselves are dependent upon the power of constitutional government to survive. If it is to survive it must have power to protect itself against unlawful conduct and, under some circumstances, against incitements to commit unlawful acts. Freedom of speech thus does not comprehend the right to speak on any subject at any time. The important question that came to this Court immediately after the First World War was not whether, but how far, the First Amendment permits the suppression of speech which advocates conduct inimical

to the public welfare.[9] Some thought speech having a reasonable tendency to lead to such conduct might be punished. Justices Holmes and Brandeis took a different view. They thought that the greater danger to a democracy lies in the suppression of public discussion; that ideas and doctrines thought harmful or dangerous are best fought with words. Only, therefore, when force is very likely to follow an utterance before there is a chance for counter-argument to have effect may that utterance be punished or prevented.[10] Thus, "the necessity which is essential to a valid restriction does not exist unless speech would produce, or is intended to produce, a clear and imminent danger of some substantive evil which the State [or Congress] constitutionally may seek to prevent . . . ." Mr. Justice Brandeis, concurring in *Whitney* v. *California,* 274 U. S. 357, 373. By this means they sought to convey the philosophy that, under the First Amendment, the public has a right to every man's views and every man the right to speak them. Government may cut him off only when his views are no longer merely views but threaten, clearly and imminently, to ripen into conduct against which the public has a right to protect itself.

---

[9] See *Schenck* v. *United States,* 249 U. S. 47 (1919); *Frohwerk* v. *United States,* 249 U. S. 204 (1919); *Debs* v. *United States,* 249 U. S. 211 (1919); *Abrams* v. *United States,* 250 U. S. 616 (1919); *Schaefer* v. *United States,* 251 U. S. 466 (1920); *Pierce* v. *United States,* 252 U. S. 239 (1920); *Gitlow* v. *New York,* 268 U. S. 652 (1925).

[10] ". . . no danger flowing from speech can be deemed clear and present, unless the incidence of the evil apprehended is so imminent that it may befall before there is opportunity for full discussion. If there be time to expose through discussion the falsehood and fallacies, to avert the evil by the processes of education, the remedy to be applied is more speech, not enforced silence." Mr. Justice Brandeis, concurring in *Whitney* v. *California,* 274 U. S. 357, 377 (1927).

But the question with which we are here faced is not the same one that Justices Holmes and Brandeis found convenient to consider in terms of clear and present danger. Government's interest here is not in preventing the dissemination of Communist doctrine or the holding of particular beliefs because it is feared that unlawful action will result therefrom if free speech is practiced. Its interest is in protecting the free flow of commerce from what Congress considers to be substantial evils of conduct that are not the products of speech at all. Section 9 (h), in other words, does not interfere with speech because Congress fears the consequences of speech; it regulates harmful conduct which Congress has determined is carried on by persons who may be identified by their political affiliations and beliefs. The Board does not contend that political strikes, the substantive evil at which § 9 (h) is aimed, are the present or impending products of advocacy of the doctrines of Communism or the expression of belief in overthrow of the Government by force. On the contrary, it points out that such strikes are called by persons who, so Congress has found, have the will and power to do so *without* advocacy or persuasion that seeks acceptance in the competition of the market.[11] Speech may be fought with speech. Falsehoods and fallacies must be exposed, not suppressed, unless there is not sufficient time to avert the evil consequences of noxious doctrine by argument and education. That is the command of the First Amendment. But force may and must be met with force. Section 9 (h) is designed to protect the public not against what Communists and others identified therein advocate or believe, but against what Congress has concluded they have done and are likely to do again.

[11] See Mr. Justice Holmes, dissenting in *Abrams* v. *United States,* 250 U. S. 616, 630 (1919).

The contention of petitioner in No. 13 that this Court must find that political strikes create a clear and present danger to the security of the Nation or of widespread industrial strife in order to sustain § 9 (h) similarly misconceives the purpose that phrase was intended to serve. In that view, not the relative certainty that evil conduct will result from speech in the immediate future, but the extent and gravity of the substantive evil must be measured by the "test" laid down in the *Schenck* case. But there the Court said that: "The question in every case is whether the *words* used are used in such circumstances and are of such a nature as to create a clear and present danger that they will bring about the substantive evils that Congress has a right to prevent." *Schenck* v. *United States, supra* at 52. (Emphasis supplied.)

So far as the *Schenck* case itself is concerned, imminent danger of any substantive evil that Congress may prevent justifies the restriction of speech. Since that time this Court has decided that however great the likelihood that a substantive evil will result, restrictions on speech and press cannot be sustained unless the evil itself is "substantial" and "relatively serious," Brandeis, J., concurring in *Whitney* v. *California, supra* at 374, 377, or sometimes "extremely serious," *Bridges* v. *California,* 314 U. S. 252, 263 (1941). And it follows therefrom that even harmful conduct cannot justify restrictions upon speech unless substantial interests of society are at stake. But in suggesting that the substantive evil must be serious and substantial, it was never the intention of this Court to lay down an absolutist test measured in terms of danger to the Nation. When the effect of a statute or ordinance upon the exercise of First Amendment freedoms is relatively small and the public interest to be protected is substantial, it is obvious that a rigid test requiring a showing of imminent danger to the security of the Nation is an absurdity. We recently dismissed for want of sub-

stantiality an appeal in which a church group contended that its First Amendment rights were violated by a municipal zoning ordinance preventing the building of churches in certain residential areas. *Corporation of the Presiding Bishop of the Church of Jesus Christ of Latter-Day Saints* v. *Porterville,* 338 U. S. 805 (1949). And recent cases in this Court involving contempt by publication likewise have no meaning if imminent danger of national peril is the criterion.[12]

On the contrary, however, the right of the public to be protected from evils of conduct, even though First Amendment rights of persons or groups are thereby in some manner infringed, has received frequent and consistent recognition by this Court. We have noted that the blaring sound truck invades the privacy of the home and may drown out others who wish to be heard. *Kovacs* v. *Cooper,* 336 U. S. 77 (1949). The unauthorized parade through city streets by a religious or political group disrupts traffic and may prevent the discharge of the most essential obligations of local government. *Cox* v. *New Hampshire,* 312 U. S. 569, 574 (1941). The exercise of particular First Amendment rights may fly in the face of the public interest in the health of children, *Prince* v. *Massachusetts,* 321 U. S. 158 (1944), or of the whole community, *Jacobson* v. *Massachusetts,* 197 U. S. 11 (1905), and it may be offensive to the moral standards of the community, *Reynolds* v. *United States,* 98 U. S. 145 (1878); *Davis* v. *Beason,* 133 U. S. 333 (1890). And Government's obligation to provide an efficient public service, *United Public Workers* v. *Mitchell,* 330 U. S. 75 (1947), and its interest in the character of members of the bar, *In re Summers,* 325 U. S. 561 (1945), sometimes admit of limitations upon rights set out in the First Amendment. And see *Giboney* v. *Empire Storage Co.,*

---

[12] *Bridges* v. *California,* 314 U. S. 252 (1941); *Pennekamp* v. *Florida,* 328 U. S. 331 (1946); *Craig* v. *Harney,* 331 U. S. 367 (1947).

336 U. S. 490, 499–501 (1949). We have never held that such freedoms are absolute. The reason is plain. As Mr. Chief Justice Hughes put it, "Civil liberties, as guaranteed by the Constitution, imply the existence of an organized society maintaining public order without which liberty itself would be lost in the excesses of unrestrained abuses." *Cox* v. *New Hampshire, supra* at 574.

When particular conduct is regulated in the interest of public order, and the regulation results in an indirect, conditional, partial abridgment of speech, the duty of the courts is to determine which of these two .conflicting interests demands the greater protection under the particular circumstances presented. The high place in which the right to speak, think, and assemble as you will was held by the Framers of the Bill of Rights and is held today by those who value liberty both as a means and an end indicates the solicitude with which we must view any assertion of personal freedoms. We must recognize, moreover, that regulation of "conduct" has all too frequently been employed by public authority as a cloak to hide censorship of unpopular ideas. We have been reminded that "It is not often in this country that we now meet with direct and candid efforts to stop speaking or publication as such. Modern inroads on these rights come from associating the speaking with some other factor which the state may regulate so as to bring the whole within official control." [13]

On the other hand, legitimate attempts to protect the public, not from the remote possible effects of noxious ideologies, but from present excesses of direct, active conduct, are not presumptively bad because they interfere with and, in some of its manifestations, restrain the exercise of First Amendment rights. *Reynolds* v. *United States, supra; Prince* v. *Massachusetts, supra; Cox* v.

---

[13] Mr. Justice Jackson, concurring in *Thomas* v. *Collins,* 323 U. S. 516, 547 (1945).

*New Hampshire, supra; Giboney* v. *Empire Storage Co., supra.* In essence, the problem is one of weighing the probable effects of the statute upon the free exercise of the right of speech and assembly against the congressional determination that political strikes are evils of conduct which cause substantial harm to interstate commerce and that Communists and others identified by § 9 (h) pose continuing threats to that public interest when in positions of union leadership. We must, therefore, undertake the "delicate and difficult task . . . to weigh the circumstances and to appraise the substantiality of the reasons advanced in support of the regulation of the free enjoyment of the rights." *Schneider* v. *State,* 308 U. S. 147, 161 (1939).

## V.

The "reasons advanced in support of the regulation" are of considerable weight, as even the opponents of § 9 (h) agreed. They are far from being "[m]ere legislative preferences or beliefs respecting matters of public convenience [which] may well support regulation directed at other personal activities, but be insufficient to justify such as diminishes the exercise of rights so vital to the maintenance of democratic institutions." [14] It should be emphasized that Congress, not the courts, is primarily charged with determination of the need for regulation of activities affecting interstate commerce. This Court must, if such regulation unduly infringes personal freedoms, declare the statute invalid under the First Amendment's command that the opportunities for free public discussion be maintained. But insofar as the problem is one of drawing inferences concerning the need for regulation of particular forms of conduct from conflicting evidence, this Court is in no position to substitute its judgment as to the necessity or desirability of the stat-

---

[14] *Schneider* v. *State,* 308 U. S. 147, 161 (1939).

ute for that of Congress. Cf. *United Public Workers* v. *Mitchell, supra* at 95, 102. In *Bridges* v. *California, supra,* we said that even restrictions on particular kinds of utterances, if enacted by a legislature after appraisal of the need, come to this Court "encased in the armor wrought by prior legislative deliberation." 314 U. S. at 261. Compare *Gitlow* v. *New York,* 268 U. S. 652 (1925). The deference due legislative determination of the need for restriction upon particular forms of conduct has found repeated expression in this Court's opinions.

When compared with ordinances and regulations dealing with littering of the streets or disturbance of householders by itinerant preachers, the relative significance and complexity of the problem of political strikes and how to deal with their leaders becomes at once apparent. It must be remembered that § 9 (h) is not an isolated statute dealing with a subject divorced from the problems of labor peace generally. It is a part of some very complex machinery set up by the Federal Government for the purpose of encouraging the peaceful settlement of labor disputes. Under the statutory scheme, unions which become collective bargaining representatives for groups of employees often represent not only members of the union but nonunion workers or members of other unions as well. Because of the necessity to have strong unions to bargain on equal terms with strong employers, individual employees are required by law to sacrifice rights which, in some cases, are valuable to them. See *J. I. Case Co.* v. *Labor Board,* 321 U. S. 332 (1944). The loss of individual rights for the greater benefit of the group results in a tremendous increase in the power of the representative of the group—the union. But power is never without responsibility. And when authority derives in part from Government's thumb on the scales, the exercise of that power by private persons becomes closely akin, in some respects, to its exercise by Government itself.

See *Graham* v. *Brotherhood of Locomotive Firemen,* 338 U. S. 232 (1949); *Steele* v. *Louisville & N. R. Co.,* 323 U. S. 192 (1944); *Tunstall* v. *Brotherhood of Locomotive Firemen,* 323 U. S. 210 (1944); *Wallace Corp.* v. *Labor Board,* 323 U. S. 248, 255 (1944); *Railway Mail Association* v. *Corsi,* 326 U. S. 88, 94 (1945).

We do not suggest that labor unions which utilize the facilities of the National Labor Relations Board become Government agencies or may be regulated as such. But it is plain that when Congress clothes the bargaining representative "with powers comparable to those possessed by a legislative body both to create and restrict the rights of those whom it represents," [15] the public interest in the good faith exercise of that power is very great.

What of the effects of § 9 (h) upon the rights of speech and assembly of those proscribed by its terms? The statute does not prevent or punish by criminal sanctions the making of a speech, the affiliation with any organization, or the holding of any belief. But as we have noted, the fact that no direct restraint or punishment is imposed upon speech or assembly does not determine the free speech question. Under some circumstances, indirect "discouragements" undoubtedly have the same coercive effect upon the exercise of First Amendment rights as imprisonment, fines, injunctions or taxes. A requirement that adherents of particular religious faiths or political parties wear identifying arm-bands, for example, is obviously of this nature.

But we have here no statute which is either frankly aimed at the suppression of dangerous ideas [16] nor one

---

[15] *Steele* v. *Louisville & N. R. Co.,* 323 U. S. 192, 202 (1944).

[16] Cf. cases cited in note 9, *supra,* and *Whitney* v. *California,* 274 U. S. 357 (1927); *Fiske* v. *Kansas,* 274 U. S. 380 (1927); *Stromberg* v. *California,* 283 U. S. 359 (1931); *Near* v. *Minnesota,* 283 U. S. 697 (1931); *De Jonge* v. *Oregon,* 299 U. S. 353 (1937); *Herndon* v. *Lowry,* 301 U. S. 242 (1937).

which, although ostensibly aimed at the regulation of conduct, may actually "be made the instrument of arbitrary suppression of free expression of views." *Hague v. Committee for Industrial Organization,* 307 U. S. 496, 516 (1939).[17] There are here involved none of the elements of censorship or prohibition of the dissemination of information that were present in the cases mainly relied upon by those attacking the statute.[18] The "discouragements" of § 9 (h) proceed, not against the groups or beliefs identified therein, but only against the combination of

[17] Cf. *Grosjean v. American Press Co.,* 297 U. S. 233 (1936); *Thomas v. Collins,* 323 U. S. 516 (1945).

[18] In *Cox v. New Hampshire,* 312 U. S. 569 (1941), Mr. Chief Justice Hughes, speaking for a unanimous Court, stated the considerations thought controlling in a number of these cases: "In *Lovell v. Griffin,* [303 U. S. 444], the ordinance prohibited the distribution of literature of any kind at any time, at any place, and in any manner without a permit from the city manager, thus striking at the very foundation of the freedom of the press by subjecting it to license and censorship. In *Hague v. Committee for Industrial Organization,* [307 U. S. 496], the ordinance dealt with the exercise of the right of assembly for the purpose of communicating views; it did not make comfort or convenience in the use of streets the standard of official action but enabled the local official absolutely to refuse a permit on his mere opinion that such refusal would prevent 'riots, disturbances or disorderly assemblage.' The ordinance thus created, as the record disclosed, an instrument of arbitrary suppression of opinions on public questions. The court said that 'uncontrolled official suppression of the privilege cannot be made a substitute for the duty to maintain order in connection with the exercise of the right.' In *Schneider v. State,* [308 U. S. 147] (p. 163) the ordinance was directed at canvassing and banned unlicensed communication of any views, or the advocacy of any cause, from door to door, subject only to the power of a police officer to determine as a censor what literature might be distributed and who might distribute it. In *Cantwell v. Connecticut,* [310 U. S. 296] (p. 305) the statute dealt with the solicitation of funds for religious causes and authorized an official to determine whether the cause was a religious one and to refuse a permit if he determined it was not, thus establishing a censorship of religion." 312 U. S. at 577–578.

those affiliations or beliefs with occupancy of a position of great power over the economy of the country. Congress has concluded that substantial harm, in the form of direct, positive action, may be expected from that combination. In this legislation, Congress did not restrain the activities of the Communist Party as a political organization; nor did it attempt to stifle beliefs. Compare *West Virginia State Board of Education* v. *Barnette,* 319 U. S. 624 (1943).[19] Section 9 (h) touches only a relative handful of persons, leaving the great majority of persons of the identified affiliations and beliefs completely free from restraint. And it leaves those few who are affected free to maintain their affiliations and beliefs subject only to possible loss of positions which Congress has concluded are being abused to the injury of the public by members of the described groups.

We have previously had occasion to consider other statutes and regulations in which the interests involved were, in large measure, like those now being considered. In *United Public Workers* v. *Mitchell, supra,* we upheld

---

[19] In the *Barnette* case, the Court was careful to point out that the sole interest of the State was in securing uniformity of belief by compelling utterance of a prescribed pledge, and that refusal to comply with the State order resulted in punishment for both parent and child: "The freedom asserted by these appellees does not bring them into collision with rights asserted by any other individual. It is such conflicts which most frequently require intervention of the State to determine where the rights of one end and those of another begin. But the refusal of these persons to participate in the ceremony does not interfere with or deny rights of others to do so. Nor is there any question in this case that their behavior is peaceable and orderly. The sole conflict is between authority and rights of the individual. The State asserts power to condition access to public education on making a prescribed sign and profession and at the same time to coerce attendance by punishing both parent and child. The latter stand on a right of self-determination in matters that touch individual opinion and personal attitude." 319 U. S. at 630–631.

a statute which provided that employees of the Federal Government could not participate in partisan political activities, concededly a First Amendment right, if they would retain their positions. The decision was not put upon the ground that government employment is a privilege to be conferred or withheld at will. For it was recognized that Congress may not "enact a regulation providing that no Republican, Jew or Negro shall be appointed to federal office, or that no federal employee shall attend Mass or take any active part in missionary work." 330 U. S. at 100. But the rational connection between the prohibitions of the statute and its objects, the limited scope of the abridgment of First Amendment rights, and the large public interest in the efficiency of government service, which Congress had found necessitated the statute, led us to the conclusion that the statute may stand consistently with the First Amendment.

Similarly, in *In re Summers, supra,* we upheld the refusal of a state supreme court to admit to membership of its bar an otherwise qualified person on the sole ground that he had conscientious scruples against war and would not use force to prevent wrong under any circumstances. Since he could not, so the justices of the state court found, swear in good faith to uphold the state constitution, which requires service in the militia in time of war, we held that refusal to permit him to practice law did not violate the First Amendment, as its commands are incorporated in the Due Process Clause of the Fourteenth Amendment. Again, the relation between the obligations of membership in the bar and service required by the state in time of war, the limited effect of the state's holding upon speech and assembly, and the strong interest which every state court has in the persons who become officers of the court were thought sufficient to justify the state action. See also *Hamilton* v. *Regents, supra.*

It is contended that the principle that statutes touching First Amendment freedoms must be narrowly drawn dictates that a statute aimed at political strikes should make the calling of such strikes unlawful but should not attempt to bring about the removal of union officers, with its attendant effect upon First Amendment rights. We think, however, that the legislative judgment that interstate commerce must be protected from a continuing threat of such strikes is a permissible one in this case. The fact that the injury to interstate commerce would be an accomplished fact before any sanctions could be applied, the possibility that a large number of such strikes might be called at a time of external or internal crisis, and the practical difficulties which would be encountered in detecting illegal activities of this kind are factors which are persuasive that Congress should not be powerless to remove the threat, not limited to punishing the act. We recently said that "nothing in the Constitution prevents Congress from acting in time to prevent potential injury to the national economy from becoming a reality." *North American Co.* v. *Securities & Exchange Commission,* 327 U. S. 686, 711 (1946). While this statement may be subject to some qualification, it indicates the wide scope of congressional power to keep from the channels of commerce that which would hinder and obstruct such commerce.

## VI.

Previous discussion has considered the constitutional questions raised by § 9 (h) as they apply alike to members of the Communist Party and affiliated organizations and to persons who believe in overthrow of the Government by force. The breadth of the provision concerning belief in overthrow of the Government by force would raise additional questions, however, if it were read

very literally to include all persons who might, under any conceivable circumstances, subscribe to that belief.

But we see no reason to construe the statute so broadly. It is within the power and is the duty of this Court to construe a statute so as to avoid the danger of unconstitutionality if it may be done in consonance with the legislative purpose. *United States* v. *Congress of Industrial Organizations,* 335 U. S. 106, 120–121 (1948); *United States* v. *Delaware & Hudson Co.,* 213 U. S. 366, 407–408 (1909). In enacting § 9 (h), Congress had as its objective the protection of interstate commerce from direct interference, not any intent to disturb or proscribe beliefs as such. Its manifest purpose was to bring within the terms of the statute only those persons whose beliefs strongly indicate a will to engage in political strikes and other forms of direct action when, as officers, they direct union activities. The congressional purpose is therefore served if we construe the clause, "that he does not believe in, and is not a member of or supports any organization that believes in or teaches, the overthrow of the United States Government by force or by any illegal or unconstitutional methods," to apply to persons and organizations who believe in violent overthrow of the Government as it presently exists under the Constitution as an objective, not merely a prophecy. Congress might well find that such persons—those who believe that the present form of the Government of the United States should be changed by force or other illegal methods—would carry that objective into their conduct of union affairs by calling political strikes designed to weaken and divide the American people, whether they consider actual overthrow of the Government to be near or distant. It is to those persons that § 9 (h) is intended to apply, and only to them. We hold, therefore, that the belief identified in § 9 (h) is a belief in the objective of overthrow by force or by any illegal or unconstitutional

methods of the Government of the United States as it now exists under the Constitution and laws thereof.

As thus construed, we think that the "belief" provision of the oath presents no different problem from that present in that part of the section having to do with membership in the Communist Party. Of course we agree that one may not be imprisoned or executed because he holds particular beliefs. But to attack the straw man of "thought control" is to ignore the fact that the sole effect of the statute upon one who believes in overthrow of the Government by force and violence—and does not deny his belief— is that he may be forced to relinquish his position as a union leader. That fact was crucial in our discussion of the statute as it relates to membership in the Communist Party. To quote, with pertinent substitutions, an apt statement of that principle, *post,* p. 434: "The Act does not suppress or outlaw the [belief in overthrow of the Government], nor prohibit it or [those who hold that belief] from engaging in any aboveboard activity . . . . No individual is forbidden to be or to become a philosophical [believer in overthrow of Government] or a full-fledged member of [a group which holds that belief]. No one is penalized for writing or speaking in favor of [such a belief] or its philosophy. Also, the Act does not require or forbid anything whatever to any person merely because he is [a believer in overthrow of the Government by force]. It applies only to one who becomes an officer of a labor union."

If the principle that one may under no circumstances be required to state his beliefs on any subject nor suffer the loss of any right or privilege because of his beliefs be a valid one, its application in other possible situations becomes relevant. Suppose, for example, that a federal statute provides that no person may become a member of the Secret Service force assigned to protect the President unless he swears that he does not believe in assassination

of the President. Is this beyond the power of Congress, whatever the need revealed by its investigations? An affirmative answer hardly commends itself to reason unless, indeed, the Bill of Rights has been converted into a "suicide pact." *Terminiello* v. *Chicago,* 337 U. S. 1, 37 (1949) (dissenting opinion). Yet the example chosen is far-fetched only because of the manifest absurdity of reliance upon an oath in such a situation. One can have no doubt that the screening process in the selection of persons to occupy such positions probes far deeper than mere oath-taking can possibly do.

To hold that such an oath is permissible, on the other hand, is to admit that the circumstances under which one is asked to state his belief and the consequences which flow from his refusal to do so or his disclosure of a particular belief make a difference. The reason for the difference has been pointed out at some length above. First, the loss of a particular position is not the loss of life or liberty. We have noted that the distinction is one of degree, and it is for this reason that the effect of the statute in proscribing beliefs—like its effect in restraining speech or freedom of association—must be carefully weighed by the courts in determining whether the balance struck by Congress comports with the dictates of the Constitution. But it is inaccurate to speak of § 9 (h) as "punishing" or "forbidding" the holding of beliefs, any more than it punishes or forbids membership in the Communist Party.

Second, the public interest at stake in ascertaining one's beliefs cannot automatically be assigned at zero without consideration of the circumstances of the inquiry. If it is admitted that beliefs are springs to action, it becomes highly relevant whether the person who is asked whether he believes in overthrow of the Government by force is a general with five hundred thousand men at his command or a village constable. To argue that because the latter

may not be asked his beliefs the former must *necessarily* be exempt is to make a fetish of beliefs. The answer to the implication that if this statute is upheld "then the power of government over beliefs is as unlimited as its power over conduct and the way is open to force disclosure of attitudes on all manner of social, economic, moral and political issues," *post,* p. 438, is that that result does not follow "while this Court sits."[20] The circumstances giving rise to the inquiry, then, are likewise factors to be weighed by the courts, giving due weight, of course, to the congressional judgment concerning the need. In short, the problem of balancing the conflicting individual and national interests involved is no different from the problem presented by proscriptions based upon political affiliations.

Insofar as a distinction between beliefs and political affiliations is based upon absence of any "overt act" in the former case, it is relevant, if at all, in connection with problems of proof. In proving that one swore falsely

---

[20] *Panhandle Oil Co.* v. *Knox,* 277 U. S. 218, 223 (1928) (dissenting opinion). The words of Mr. Justice Holmes, while written concerning a very different problem, are well worth rereading in this connection:

"It seems to me that the State Court was right. I should say plainly right, but for the effect of certain dicta of Chief Justice Marshall which culminated in or rather were founded upon his often quoted proposition that the power to tax is the power to destroy. In those days it was not recognized as it is today that most of the distinctions of the law are distinctions of degree. If the States had any power it was assumed that they had all power, and that the necessary alternative was to deny it altogether. But this Court which so often has defeated the attempt to tax in certain ways can defeat an attempt to discriminate or otherwise go too far without wholly abolishing the power to tax. The power to tax is not the power to destroy while this Court sits. The power to fix rates is the power to destroy if unlimited, but this Court while it endeavors to prevent confiscation does not prevent the fixing of rates. A tax is not an unconstitutional regulation in every case where an absolute prohibition of sales would be one. *Hatch* v. *Reardon,* 204 U. S. 152, 162."

that he is not a Communist, the act of joining the Party is crucial. Proof that one lied in swearing that he does not believe in overthrow of the Government by force, on the other hand, must consist in proof of his mental state. To that extent they differ.

To state the difference, however, is but to recognize that while objective facts may be proved directly, the state of a man's mind must be inferred from the things he says or does. Of course we agree that the courts cannot "ascertain the thought that has had no outward manifestation." But courts and juries every day pass upon knowledge, belief and intent—the state of men's minds—having before them no more than evidence of their words and conduct, from which, in ordinary human experience, mental condition may be inferred. See 2 Wigmore, Evidence (3d ed.) §§ 244, 256 *et seq.* False swearing in signing the affidavit must, as in other cases where mental state is in issue, be proved by the outward manifestations of state of mind. In the absence of such manifestations, which are as much "overt acts" as the act of joining the Communist Party, there can be no successful prosecution for false swearing.[21]

Considering the circumstances surrounding the problem—the deference due the congressional judgment concerning the need for regulation of conduct affecting interstate commerce and the effect of the statute upon rights of speech, assembly and belief—we conclude that § 9 (h)

---

[21] While it is true that state of mind is ordinarily relevant only when it is incidental to, and determines the quality of, some overt act (but cf. *Hamilton* v. *Regents,* 293 U. S. 245 (1934); *In re Summers,* 325 U. S. 561 (1945)), the fact must not be overlooked that mental state in such cases is a distinct issue, 2 Wigmore, Evidence (3d ed.) §§ 244, 266, of which the "overt act" may or may not be any proof. For example, the physical facts surrounding a death by shooting may be as consistent with a finding of accident as of murder. Wilfullness, malice and premeditation must therefore be proved by evidence wholly apart from the act of shooting.

of the National Labor Relations Act, as amended by the Labor Management Relations Act, 1947, does not unduly infringe freedoms protected by the First Amendment. Those who, so Congress has found, would subvert the public interest cannot escape all regulation because, at the same time, they carry on legitimate political activities. Cf. *Valentine* v. *Chrestensen*, 316 U. S. 52 (1942). To encourage unions to displace them from positions of great power over the national economy, while at the same time leaving free the outlets by which they may pursue legitimate political activities of persuasion and advocacy, does not seem to us to contravene the purposes of the First Amendment. That Amendment requires that one be permitted to believe what he will. It requires that one be permitted to advocate what he will unless there is a clear and present danger that a substantial public evil will result therefrom. It does not require that he be permitted to be the keeper of the arsenal.

## VII.

There remain two contentions which merit discussion. One is that § 9 (h) is unconstitutionally vague. The other is that it violates the mandate of Art. I, § 9 of the Constitution that "No Bill of Attainder or ex post facto Law shall be passed."

The argument as to vagueness stresses the breadth of such terms as "affiliated," "supports" and "illegal or unconstitutional methods." There is little doubt that imagination can conjure up hypothetical cases in which the meaning of these terms will be in nice question. The applicable standard, however, is not one of wholly consistent academic definition of abstract terms. It is, rather, the practical criterion of fair notice to those to whom the statute is directed. The particular context is all important.

The only criminal punishment specified is the application of § 35 (A) of the Criminal Code, 18 U. S. C. § 1001, which covers only those false statements made

"knowingly and willfully." The question in any criminal prosecution involving a non-Communist affidavit must therefore be whether the affiant acted in good faith or knowingly lied concerning his affiliations, beliefs, support of organizations, etc. And since the constitutional vice in a vague or indefinite statute is the injustice to the accused in placing him on trial for an offense, the nature of which he is given no fair warning, the fact that punishment is restricted to acts done with knowledge that they contravene the statute makes this objection untenable. As this Court pointed out in *United States* v. *Ragen,* 314 U. S. 513, 524 (1942), "A mind intent upon willful evasion is inconsistent with surprised innocence." Cf. *Omaechevarria* v. *Idaho,* 246 U. S. 343 (1918); *Hygrade Provision Co.* v. *Sherman,* 266 U. S. 497 (1925); *Screws* v. *United States,* 325 U. S. 91 (1945). Without considering, therefore, whether in other circumstances the words used in § 9 (h) would render a statute unconstitutionally vague and indefinite, we think that the fact that under § 35 (A) of the Criminal Code no honest, untainted interpretation of those words is punishable removes the possibility of constitutional infirmity.

The unions' argument as to bill of attainder cites the familiar cases, *United States* v. *Lovett,* 328 U. S. 303 (1946); *Ex parte Garland,* 4 Wall. 333 (1867); *Cummings* v. *Missouri,* 4 Wall. 277 (1867). Those cases and this also, according to the argument, involve the proscription of certain occupations to a group classified according to belief and loyalty. But there is a decisive distinction: in the previous decisions the individuals involved were in fact being punished for *past* actions; whereas in this case they are subject to possible loss of position only because there is substantial ground for the congressional judgment that their beliefs and loyalties will be transformed into *future* conduct. Of course, the history of the past conduct is the foundation for the judgment as to what

the future conduct is likely to be; but that does not alter the conclusion that § 9 (h) is intended to prevent future action rather than to punish past action.

This distinction is emphasized by the fact that members of those groups identified in § 9 (h) are free to serve as union officers if at any time they renounce the allegiances which constituted a bar to signing the affidavit in the past. Past conduct, actual or threatened by their previous adherence to affiliations and beliefs mentioned in § 9 (h), is not a bar to resumption of the position. In the cases relied upon by the unions on the other hand, this Court has emphasized that, since the basis of disqualification was past action or loyalty, nothing that those persons proscribed by its terms could ever do would change the result. See *United States* v. *Lovett, supra,* at p. 314; *Cummings* v. *Missouri, supra,* at p. 327. Here the intention is to forestall future dangerous acts; there is no one who may not, by a voluntary alteration of the loyalties which impel him to action, become eligible to sign the affidavit. We cannot conclude that this section is a bill of attainder.

In their argument on this point, the unions seek some advantage from references to English history pertinent to a religious test oath. That experience is written into our Constitution in the following provision of Article VI: "The Senators and Representatives before mentioned, and the Members of the several State Legislatures, and all executive and judicial Officers, both of the United States and of the several States, shall be bound by Oath or Affirmation, to support this Constitution; but no religious Test shall ever be required as a Qualification to any Office or public Trust under the United States." It is obvious that not all oaths were abolished; the mere fact that § 9 (h) is in oath form hardly rises to the stature of a constitutional objection. All that was forbidden was a "religious Test." We do not think that the oath

here involved can rightly be taken as falling within that category.

Clearly the Constitution permits the requirement of oaths by officeholders to uphold the Constitution itself. The obvious implication is that those unwilling to take such an oath are to be barred from public office. For the President, a specific oath was set forth in the Constitution itself. Art. II, § 1. And Congress has detailed an oath for other federal officers.[22] Obviously, the Framers of the Constitution thought that the exaction of an affirmation of minimal loyalty to the Government was worth the price of whatever deprivation of individual freedom of conscience was involved. All that we need hold here is that the casting of § 9 (h) into the mold of an oath does not invalidate it, if it is otherwise constitutional.

We conclude that § 9 (h) of the National Labor Relations Act, as amended by the Labor Management Relations Act, 1947, as herein construed, is compatible with the Federal Constitution and may stand. The judgments of the courts below are therefore

*Affirmed.*

MR. JUSTICE DOUGLAS, MR. JUSTICE CLARK and MR. JUSTICE MINTON took no part in the consideration or decision of these cases.

MR. JUSTICE FRANKFURTER, concurring in the Court's opinion except as to Part VII.

"Scarcely any political question arises in the United States," observed the perceptive de Tocqueville as early as 1835, "that is not resolved, sooner or later, into a judicial question." 1 Democracy in America 280 (Bradley ed. 1948). And so it was to be expected that the conflict of political ideas now dividing the world more pervasively than any since this nation was founded would give rise to controversies for adjudication by this Court.

[22] 23 Stat. 22, 5 U. S. C. § 16.

"The judicial Power" with which alone this Court is invested comes into operation only as to issues that the long tradition of our history has made appropriate for disposition by judges. When such questions are properly here they are to be disposed of within those strict confines of legal reasoning which laymen too often deem invidiously technical. This restriction to justiciable issues to be disposed of in the unrhetorical manner of opinion-writing reflects respect by the judiciary for its very limited, however great, function in the proper distribution of authority in our political scheme so as to avoid autocratic rule. No doubt issues like those now before us cannot be completely severed from the political and emotional context out of which they emerge. For that very reason adjudication touching such matters should not go one whit beyond the immediate issues requiring decision, and what is said in support of the adjudication should insulate the Court as far as is rationally possible from the political conflict beneath the legal issues.

The central problem presented by the enactment now challenged is the power of Congress, as part of its comprehensive scheme for industrial peace, to keep Communists out of controlling positions in labor unions as a condition to utilizing the opportunities afforded by the National Labor Relations Act, as amended by the Labor Management Relations Act, 1947.[1] Wrapped up

---

[1] Section 9 (h) requires each officer of a union seeking to invoke the machinery of the Labor Management Relations Act to submit an affidavit "that he is not a member of the Communist Party or affiliated with such party, and that he does not believe in, and is not a member of or supports any organization that believes in or teaches, the overthrow of the United States Government by force or by any illegal or unconstitutional methods." 61 Stat. 146, 29 U. S. C. (Supp. III) § 159 (h). The provisions of what is now 18 U. S. C. § 1001, formerly § 35 (A) of the Criminal Code, are made applicable in respect to such affidavits.

in this problem are two great concerns of our democratic society—the right of association for economic and social betterment and the right of association for political purposes. It is too late in the day to deny to Congress the power to promote industrial peace in all the far-flung range of interstate commerce. To that end, Congress may take appropriate measures to protect interstate commerce against disruptive conduct not fairly related to industrial betterment within our democratic framework. It is one thing to forbid heretical political thought merely as heretical thought. It is quite a different thing for Congress to restrict attempts to bring about another scheme of society, not through appeal to reason and the use of the ballot as democracy has been pursued throughout our history, but through an associated effort to disrupt industry.

Thus stated, it would make undue inroads upon the policy-making power of Congress to deny it the right to protect the industrial peace of the country by excluding from leadership in trade unions which seek to avail themselves of the machinery of the Labor Management Relations Act those who are united for action against our democratic process. This is so not because Congress in affording a facility can subject it to any condition it pleases. It cannot. Congress may withhold all sorts of facilities for a better life but if it affords them it cannot make them available in an obviously arbitrary way or exact surrender of freedoms unrelated to the purpose of the facilities. Congress surely can provide for certain clearly relevant qualifications of responsibility on the part of leaders of trade unions invoking the machinery of the Labor Management Relations Act. The essential question now is whether Congress may determine that membership of union officers in the Communist Party creates such an obvious hazard to the peace-promoting purposes of the Act that access to the machin-

ery of the Act may be denied unions which prefer their freedom to have officers who are Communists to their opportunities under the Act.

When we are dealing with conflicting freedoms, as we are on the issues before us, we are dealing with large concepts that too readily lend themselves to explosive rhetoric. We are also dealing with matters as to which different nuances in phrasing the same conclusion lead to different emphasis and thereby eventually may lead to different conclusions in slightly different situations. From my point of view these are issues as to which it would be desirable for the members of the Court to write full-length individual opinions. The Court's business in our time being what it is precludes this. It must suffice for me to say that the judgment of Congress that trade unions which are guided by officers who are committed by ties of membership to the Communist Party must forego the advantages of the Labor Management Relations Act is reasonably related to the accomplishment of the purposes which Congress constitutionally had a right to pursue. To deny that that is a judgment which Congress may, as a matter of experience, enforce even though it involves the indicated restrictions upon freedom would be to make naïveté a requirement in judges. Since the Court's opinion, in the main, expresses the point of view which I have very inadequately sketched, I join it except as qualified in what follows.

Congress was concerned with what it justifiably deemed to be the disorganizing purposes of Communists who hold positions of official power in labor unions, or, at the least, what it might well deem their lack of disinterested devotion to the basic tenets of the American trade union movement because of a higher loyalty to a potentially conflicting cause. But Congress did not choose merely to limit the freedom of labor unions which seek the advantages of the Labor Management Relations Act to

be led by officers who are not willing to disavow membership in the Communist Party. The scope of its legislation was much more extensive.

Legislation, in order to effectuate its purposes, may deal with radiations beyond the immediate incidence of a mischief. If a particular mischief is within the scope of congressional power, wide discretion must be allowed to Congress for dealing with it effectively. It is not the business of this Court to restrict Congress too narrowly in defining the extent or the nature of remedies. How to curb an evil, what remedies will be effective; the reach of a particular evil and therefore the appropriate scope of a remedy against it—all these are in the main matters of legislative policy not open to judicial condemnation. There are, of course, some specific restrictions in devising remedies. No matter what its notions of policy may be, the Eighth Amendment, for example, bars Congress from inflicting "cruel and unusual punishments." I do not suppose it is even arguable that Congress could ask for a disclosure of how union officers cast their ballots at the last presidential election even though the secret ballot is a relatively recent institution. See Wigmore, The Australian Ballot System 3, 15, 22 (1889). So also Congress must keep within the contours of the "due process" requirement of the Fifth Amendment, vague as they are. In order to curb a mischief Congress cannot be so indefinite in its requirements that effort to meet them raises hazards unfair to those who seek obedience or involves surrender of freedoms which exceeds what may fairly be exacted. These restrictions on the broad scope of legislative discretion are merely the law's application of the homely saws that one should not throw out the baby with the bath or burn the house in order to roast the pig.

In my view Congress has cast its net too indiscriminately in some of the provisions of § 9 (h). To ask

avowal that one "does not believe in, and is not a member of or supports any organization that believes in . . . the overthrow of the United States Government . . . by any illegal or unconstitutional methods" is to ask assurances from men regarding matters that open the door too wide to mere speculation or uncertainty. It is asking more than rightfully may be asked of ordinary men to take oath that a method is not "unconstitutional" or "illegal" when constitutionality or legality is frequently determined by this Court by the chance of a single vote.[2] It does not meet the difficulty to suggest that the hazard of a prosecution for perjury is not great since the convictions for perjury must be founded on willful falsity. To suggest that a judge might not be justified in allowing a case to go to a jury, or that a jury would not be justified in convicting, or that, on the possible happening of these events, an appellate court would be compelled to reverse, or, finally, that resort could be had to this Court for review on a petition for certiorari, affords safeguards too tenuous to neutralize the danger. See *Musser* v. *Utah*, 333 U. S. 95. The hazards that were found to be fatal to the legislation under review in *Winters* v. *New York*, 333 U. S. 507, appear trivial by comparison with what is here involved.

It is not merely the hazard of prosecution for perjury that is dependent on a correct determination as to the implications of a man's belief or the belief of others with whom he may be associated in an organization concerned with political and social issues. It should not be assumed that oaths will be lightly taken; fastidiously scrupulous regard for them should be encouraged. Therefore, it becomes most relevant whether an oath which Congress asks men to take may or may not be thought to touch

---

[2] As to the dubious scope of the term "affiliated" in the statute, see *Bridges* v. *Wixon,* 326 U. S. 135.

matters that may not be subjected to compulsory avowal of belief or disbelief. In the uncertainty of the reach of § 9 (h), one may withhold an oath because of conscientious scruples that it covers beliefs whose disclosure Congress could not in terms exact. If a man has scruples about taking an oath because of uncertainty as to whether it encompasses some beliefs that are inviolate, the surrender of abstention is invited by the ambiguity of the congressional exaction. As MR. JUSTICE JACKSON's opinion indicates, probing into men's thoughts trenches on those aspects of individual freedom which we rightly regard as the most cherished aspects of Western civilization. The cardinal article of faith of our civilization is the inviolate character of the individual. A man can be regarded as an individual and not as a function of the state only if he is protected to the largest possible extent in his thoughts and in his beliefs as the citadel of his person. Entry into that citadel can be justified, if at all, only if strictly confined so that the belief that a man is asked to reveal is so defined as to leave no fair room for doubt that he is not asked to disclose what he has a right to withhold.

No one could believe more strongly than I do that every rational indulgence should be made in favor of the constitutionality of an enactment by Congress. I deem it my duty to go to the farthest possible limits in so construing legislation as to avoid a finding that Congress has exceeded the limits of its powers. See, *e. g.*, *United States* v. *Lovett,* 328 U. S. 303, 318, 329; *Shapiro* v. *United States,* 335 U. S. 1, 36; *United States* v. *C. I. O.,* 335 U. S. 106, 124, 129.

If I possibly could, to avoid questions of unconstitutionality I would construe the requirements of § 9 (h) to be restricted to disavowal of actual membership in the Communist Party, or in an organization that is in fact a controlled cover for that Party or of active belief,

as a matter of present policy, in the overthrow of the Government of the United States by force. But what Congress has written does not permit such a gloss nor deletion of what it has written. See *Yu Cong Eng* v. *Trinidad,* 271 U. S. 500. I cannot deem it within the rightful authority of Congress to probe into opinions that involve only an argumentative demonstration of some coincidental parallelism of belief with some of the beliefs of those who direct the policy of the Communist Party, though without any allegiance to it. To require oaths as to matters that open up such possibilities invades the inner life of men whose compassionate thought or doctrinaire hopes may be as far removed from any dangerous kinship with the Communist creed as were those of the founders of the present orthodox political parties in this country.

The offensive provisions of § 9 (h) leave unaffected, however, the valid portions of the section. In § 16, Congress has made express provision for such severance. Since the judgments below were based in part on what I deem unconstitutional requirements, I cannot affirm but would remand to give opportunity to obey merely the valid portions of § 9 (h).

MR. JUSTICE JACKSON, concurring and dissenting, each in part.

If the statute before us required labor union officers to forswear membership in the Republican Party, the Democratic Party or the Socialist Party, I suppose all agree that it would be unconstitutional. But why, if it is valid as to the Communist Party?

The answer, for me, is in the decisive differences between the Communist Party and every other party of any importance in the long experience of the United States with party government. In order that today's decision may not be useful as a precedent for suppression of any

political opposition compatible with our free institutions, I limit concurrence to grounds and distinctions explicitly set forth herein, without which I should regard this Act as unconstitutional.

To state controlling criteria definitively is both important and difficult, because those Communist Party activities visible to the public closely resemble those of any other party. Parties, whether in office or out, are often irresponsible in their use and abuse of freedoms of speech and press. They all make scapegoats of unpopular persons or classes and make promises of dubious sincerity or feasibility in order to win votes. All parties, when in opposition, strive to discredit and embarrass the Government of the day by spreading exaggerations and untruths and by inciting prejudiced or unreasoning discontent, not even hesitating to injure the Nation's prestige among the family of nations. The Communist Party, at least outwardly, only exaggerates these well-worn political techniques and many persons are thus led to think of it as just another more radical political party. If it were nothing but that, I think this legislation would be unconstitutional. There are, however, contradictions between what meets the eye and what is covertly done, which, in my view of the issues, provide a rational basis upon which Congress reasonably could have concluded[1] that the Communist Party is something different in fact from any other substantial party we have known, and hence may constitutionally be treated as something different in law.

---

[1] Of course, it is not for any member of this Court to express or to act upon any opinion he may have as to the wisdom, effectiveness or need of this legislation. Our "inquiries, where the legislative judgment is drawn in question, must be restricted to the issue whether any state of facts either known or which could reasonably be assumed affords support for it." *United States* v. *Carolene Products Co.,* 304 U. S. 144, 154.

## I.

From information before its several Committees and from facts of general knowledge, Congress could rationally conclude that, behind its political party façade, the Communist Party is a conspiratorial and revolutionary junta, organized to reach ends and to use methods which are incompatible with our constitutional system. A rough and compressed grouping of this data [2] would permit Congress to draw these important conclusions as to its distinguishing characteristics.

[2] It is unnecessary to set out a comprehensive compendium of the materials which Congress may or could have considered, or to review the voluminous evidence before its several Committees, much of which is already referred to in the Court's opinion. Most of this information would be of doubtful admissibility or credibility in a judicial proceeding. Its persuasiveness, validity and credibility for legislative purposes are for Congress, see n. 1, *supra*. I intimate no opinion as to its sufficiency for purposes of a criminal trial.

An introduction to the literature on the subject may be found in: Cohen and Fuchs, *Communism's Challenge and the Constitution*, 34 Cornell L. Q. 182; Moore, *The Communist Party of the U. S. A.*, 39 Am. Pol. Sci. Rev. 31; Timasheff, *The Schneiderman Case—Its Political Aspects*, 12 Ford. L. Rev. 209; Note, 32 Georgetown L. J. 405, 411–418; Emerson & Helfeld, *Loyalty Among Government Employees*, 58 Yale L. J. 1, 61–64; Donovan & Jones, *Program For a Democratic Counter Attack to Communist Penetration of Government Service*, 58 Yale L. J. 1211, 1215–1222; and see Notes, 48 Col. L. Rev. 253; 96 U. of Pa. L. Rev. 381; 1 Stanford L. Rev. 85; 23 Notre Dame Lawyer 577; 34 Va. L. Rev. 439, 450.

See also Mills, *The New Men of Power* (1948) 186–200; Levenstein, *Labor Today and Tomorrow* (1945) 159–177; Teller, *Management Functions under Collective Bargaining* (1947) 401–410; Smith, *Spotlight on Labor Unions* (1946) 40–43, 63–67, 79–82; Taft, *Economics and Problems of Labor* (1948) 499–501, 722; Saposs, *Left Wing Unionism* (1926) 48–65; Foster, *From Bryan to Stalin* (1937) 275–277; Gitlow, *I Confess* (1940) 334–395; *The Communist in Labor Relations Today* (Research Institute of America, New York, March 28, 1946) ; Baldwin, *Union Administration and Civil Liberties*, 248 Annals 54, 59; *Labor Abroad*, Dec. 1947, No. 5 (U. S. Dept. of

1. *The goal of the Communist Party is to seize powers of government by and for a minority rather than to acquire power through the vote of a free electorate.* It seeks not merely a change of administration, or of Congress, or reform legislation within the constitutional framework. Its program is not merely to socialize property more rapidly and extensively than the other parties are doing. While the difference between other parties in these matters is largely as to pace, the Communist Party's difference is one of direction.

The Communist program only begins with seizure of government, which then becomes a means to impose upon society an organization on principles fundamentally opposed to those presupposed by our Constitution. It purposes forcibly to recast our whole social and political structure after the Muscovite model of police-state dictatorship. It rejects the entire religious and cultural heritage of Western civilization, as well as the American economic and political systems. This Communist movement is a belated counter-revolution to the American Revolution, designed to undo the Declaration of Independence, the Constitution, and our Bill of Rights, and overturn our system of free, representative self-government.

Goals so extreme and offensive to American tradition and aspiration obviously could not be attained or approached through order or with tranquility. If, by their better organization and discipline, they were successful, more candid Communists admit that it would be to an

Labor, Bureau of Labor Statistics) 3; *Labor Abroad,* Feb. 1948, No. 6 (U. S. Dept. of Labor, Bureau of Labor Statistics) 1–3; *Postwar Labor Movement in Italy,* 68 Monthly Labor Review (U. S. Dept. of Labor, Bureau of Labor Statistics) 49. For the story of American political parties see Binkley, *American Political Parties* (2d ed., 1945); 2 Bryce, *The American Commonwealth* (2d ed. rev. 1891); and on the Communist Party, in addition to materials above cited, Odegard and Helms, *American Politics* (1938) 795–797.

accompaniment of violence, but at the same time they disclaim responsibility by blaming the violence upon those who engage in resistance or reprisal. It matters little by whom the first blow would be struck; no one can doubt that an era of violence and oppression, confiscations and liquidations would be concurrent with a regime of Communism.

Such goals set up a cleavage among us too fundamental to be composed by democratic processes. Our constitutional scheme of elections will not settle issues between large groups when the price of losing is to suffer extinction. When dissensions cut too deeply, men will fight, even hopelessly, before they will submit.[3] And this is the kind of struggle projected by the Communist Party and inherent in its program.

---

[3] Such is the view of students of Western society, with outlook so opposed as Lord Balfour and Harold Laski. Balfour wrote:

"Our alternating Cabinets, though belonging to different parties, have never differed about the foundation of society, and it is evident that our whole political machinery presupposes a people so fundamentally at one that they can afford to bicker; and so sure of their own moderation that they are not dangerously disturbed by the never-ending din of political conflict. May it always be so." Preface to the World's Classics edition of Bagehot's *English Constitution,* p. xxiii.

Laski commented:

"In an interesting passage [citing the above] Lord Balfour has drawn attention to the fact that the success of the British Constitution in the Nineteenth Century—it is worth adding the general success of representative government—was built upon an agreement between parties in the state upon fundamental principles. There was, that is, a kindred outlook upon large issues; and since fighting was confined to matters of comparative detail, men were prepared to let reason have its sway in the realm of conflict. For it is significant that in the one realm where depth of feeling was passionate—Irish home rule—events moved rapidly to the test of the sword; and the settlement made was effected by violence and not by reason." Laski, *Liberty in the Modern State,* 238.

If we substitute the Civil War for Irish home rule, these statements become as applicable to the United States as they are to England.

2. *The Communist Party alone among American parties past or present is dominated and controlled by a foreign government.* It is a satrap party which, to the threat of civil disorder, adds the threat of betrayal into alien hands.

The chain of command from the Kremlin to the American party is stoutly denied and usually invisible, but it was unmistakably disclosed by the American Communist Party somersaulting in synchronism with shifts in the Kremlin's foreign policy. Before Munich, Soviet policy was anti-German—"anti-fascist"—and the Communists in this country were likewise. However, when Stalin concluded a nonaggression pact with Hitler and Nazi Germany and the Soviet Union became partners in the war, the Communists here did everything within their power to retard and embarrass the United States' policy of rendering aid short of war to victims of aggression by that evil partnership. When those partners again fell out and Russian policy once more became anti-German, the Communists in this country made an abrupt and fierce reversal and were unconscionable in their demands that American soldiers, whose equipment they had delayed and sabotaged, be sacrificed in a premature second front to spare Russia. American Communists, like Communists elsewhere in the world, placed Moscow's demand above every patriotic interest.

By lineage and composition the Communist Party will remain peculiarly susceptible to this alien control. The entire apparatus of Communism—its grievances, program, propaganda and vocabulary—were evolved for Eastern and Central Europe, whose social and political conditions bear no semblance to our own. However gifted may have been the Communist Party's founders and leaders—Marx, Engels, Lenin and Stalin—not one of them ever lived in America, experienced our conditions, or imbibed the spirit of our institutions. The Communist

Party is not native to this country and its beginnings here were not an effort of Americans to answer American problems. Nor is it the response to a quest by American political leaders for lessons from European experiences. As a consequence, the leaders of the American Communist Party have been otherwise insignificant personalities, without personal political followings or aptitudes for our political methods, adapted by training only to boring their way into the labor movement, minority groups and coteries of naïve and confused liberals, whose organizations they have captured and discredited and among whom they lie in wait for further orders.

The Old World may be rich in lessons which our statesmen could consult with advantage. But it is one thing to learn from or support a foreign power because that policy serves American interests, and another thing to support American policies because they will serve foreign interests.[4] In each country where the Communists have seized control, they have so denationalized its foreign policy as to make it a satellite and vassal of the Soviet Union and enforced a domestic policy in complete conformity with the Soviet pattern, tolerating no deviation in deference to any people's separate history, tradition or national interests.

---

[4] To compare attacks against Thomas Jefferson with attacks against the Communist leaders—as Communists generally do [*e. g.* Dennis, *Let the People Know* (1947) 13]—would be meaningful only if his character and motives were comparable to those of the Communist leaders. When we consider that Jefferson was the author of Virginia's Statute of Religious Liberty, was war Governor of Virginia, risked his life to sign the Declaration of Independence, was Secretary of State in President Washington's Cabinet and became President of the United States through the influence of Alexander Hamilton, it seems sacrilegious to liken Jefferson's motives in supporting certain phases of French policy with Communist allegiance to the Kremlin.

3. *Violent and undemocratic means are the calculated and indispensable methods to attain the Communist Party's goal.* It would be incredible naïveté to expect the American branch of this movement to forego the only methods by which a Communist Party has anywhere come into power. In not one of the countries it now dominates was the Communist Party chosen by a free or contestible election; in not one can it be evicted by any election. The international police state has crept over Eastern Europe by deception, coercion, *coup d'état,* terrorism and assassination. Not only has it overpowered its critics and opponents; it has usually liquidated them. The American Communist Party has copied the organizational structure and its leaders have been schooled in the same technique and by the same tutors.

The American Communists have imported the totalitarian organization's disciplines and techniques, notwithstanding the fact that this country offers them and other discontented elements a way to peaceful revolution by ballot.[5] If they can persuade enough citizens, they may not only name new officials and inaugurate new policies, but, by amendment of the Constitution, they can abolish the Bill of Rights and set up an absolute government by legal methods. They are given liberties of speech, press and assembly to enable them to present to the people their proposals and propaganda for peaceful and lawful changes, however extreme. But instead of resting their case upon persuasion and any appeal inherent in their ideas and principles, the Communist Party adopts the techniques of a secret cabal—false names, forged passports, code messages, clandestine meetings. To these it adds occasional terroristic and threatening methods,

---

[5] Changes as decisive as those wrought by most revolutions resulted from the election of Jefferson in 1800, Jackson in 1828, Lincoln in 1860, and Roosevelt in 1932.

such as picketing courts and juries, political strikes and sabotage.

This cabalism and terrorism is understandable in the light of what they want to accomplish and what they have to overcome. The Communist program does not presently, nor in foreseeable future elections, commend itself to enough American voters to be a substantial political force. Unless the Communist Party can obtain some powerful leverage on the population, it is doomed to remain a negligible factor in the United States. Hence, conspiracy, violence, intimidation and the *coup d'état* are all that keep hope alive in the Communist breast.

4. *The Communist Party has sought to gain this leverage and hold on the American population by acquiring control of the labor movement.* All political parties have wooed labor and its leaders. But what other parties seek is principally the vote of labor. The Communist Party, on the other hand, is not primarily interested in labor's vote, for it does not expect to win by votes. It strives for control of labor's coercive power—the strike, the sit-down, the slow-down, sabotage, or other means of producing industrial paralysis. Congress has legalized the strike as labor's weapon for improving its own lot. But where Communists have labor control, the strike can be and sometimes is perverted to a party weapon. In 1940 and 1941, undisclosed Communists used their labor offices to sabotage this Nation's effort to rebuild its own defenses. Disguised as leaders of free American labor, they were in truth secret partisans of Stalin, who, in partnership with Hitler, was overrunning Europe, sending honest labor leaders to concentration camps, and reducing labor to slavery in every land either of them was able to occupy. No other important political party in our history has attempted to use the strike to nullify a foreign or a domestic policy adopted by those chosen under our representative system.

This labor leverage, however, usually can be obtained only by concealing the Communist tie from the union membership. Whatever grievances American workmen may have with American employers, they are too intelligent and informed to seek a remedy through a Communist Party which defends Soviet conscription of labor, forced labor camps and the police state. Hence the resort to concealment, and hence the resentment of laws to compel disclosure of Communist Party ties. The membership is not likely to entrust its bargaining power, its records, and its treasury to such hands. When it does, the union finds itself a more or less helpless captive of the Communist Party. Its officers cease to be interested in correcting grievances but seek to worsen and exploit them; they care less for winning strikes than that they be long, bitter and disruptive. They always follow the Communist Party line, without even knowing its source or its objectives. The most promising course of the Communist Party has been the undercover capture of the coercive power of strategic labor unions as a leverage to magnify its power over the American people.

5. *Every member of the Communist Party is an agent to execute the Communist program.* What constitutes a party? Major political parties in the United States have never been closely knit or secret organizations. Anyone who usually votes the party ticket is reckoned a member, although he has not applied for or been admitted to membership, pays no dues, has taken no pledge, and is free to vote, speak and act as he wills. Followers are held together by rather casual acceptance of general principles, the influence of leaders, and sometimes by the cohesive power of patronage. Membership in the party carries with it little assurance that the member understands or believes in its principles and none at all that he will take orders from its leaders. One may quarrel with the party and bolt its candidates and return

again as much a member as those who were regular. And it is often a source of grief to those who have labored long in the vineyard that late arrivals are taken into the party councils from other parties without scrutiny. Of course, when party organization is of this character, there is little ground for inference that all members are committed to party plans or that they are agents for their execution.

Membership in the Communist Party is totally different. The Party is a secret conclave. Members are admitted only upon acceptance as reliable and after indoctrination in its policies, to which the member is fully committed. They are provided with cards or credentials, usually issued under false names so that the identification can only be made by officers of the Party who hold the code. Moreover, each pledges unconditional obedience to party authority. Adherents are known by secret or code names. They constitute "cells" in the factory, the office, the political society, or the labor union. For any deviation from the party line they are purged and excluded.

Inferences from membership in such an organization are justifiably different from those to be drawn from membership in the usual type of political party. Individuals who assume such obligations are chargeable, on ordinary conspiracy principles, with responsibility for and participation in all that makes up the Party's program. The conspiracy principle has traditionally been employed to protect society against all "ganging up" or concerted action in violation of its laws. No term passes that this Court does not sustain convictions based on that doctrine for violations of the antitrust laws or other statutes.[6]

---

[6] I have taken pains to point out that the whole doctrine of conspiracy and its abuse presents a danger to the fair administration of justice. Concurring opinion, *Krulewitch* v. *United States,* 336 U. S. 440, 445.

However, there has recently entered the dialectic of politics a cliché used to condemn application of the conspiracy principle to Communists. "Guilt by association" is an epithet frequently used and little explained, except that it is generally accompanied by another slogan, "guilt is personal." Of course it is; but personal guilt may be incurred by joining a conspiracy. That act of association makes one responsible for the acts of others committed in pursuance of the association. It is wholly a question of the sufficiency of evidence of association to imply conspiracy. There is certainly sufficient evidence that all members owe allegiance to every detail of the Communist Party program and have assumed a duty actively to help execute it, so that Congress could, on familiar conspiracy principles, charge each member with responsibility for the goals and means of the Party.

Such then is the background which Congress could reasonably find as a basis for exerting its constitutional powers, and which the judiciary cannot disregard in testing them. On this hypothesis we may revert to consideration of the contention of unconstitutionality of this oath insofar as it requires disclosure of Communist Party membership or affiliation.

## II.

I cannot believe that Congress has less power to protect a labor union from Communist Party domination than it has from employer domination. This Court has uncompromisingly upheld power of Congress to disestablish labor unions where they are company-dominated and to eradicate employer influence, even when exerted only through spoken or written words which any person not the employer would be free to utter.[7]

Congress has conferred upon labor unions important rights and powers in matters that affect industry, trans-

---

[7] See cases collected in *Thomas* v. *Collins*, 323 U. S. 516, 548.

port, communications, and commerce. And Congress has not now denied any union full self-government nor prohibited any union from choosing Communist officers. It seeks to protect the union from doing so unknowingly. And if members deliberately choose to put the union in the hands of Communist officers, Congress withdraws the privileges it has conferred on the assumption that they will be devoted to the welfare of their members. It would be strange indeed if it were constitutionally powerless to protect these delegated functions from abuse and misappropriation to the service of the Communist Party and the Soviet Union. Our Constitution is not a covenant of nonresistance toward organized efforts at disruption and betrayal, either of labor or of the country.

Counsel stress that this is a civil-rights or a free-speech or a free-press case. But it is important to note what this Act does not do. The Act does not suppress or outlaw the Communist Party, nor prohibit it or its members from engaging in any aboveboard activity normal in party struggles under our political system. It may continue to nominate candidates, hold meetings, conduct campaigns and issue propaganda, just as other parties may. No individual is forbidden to be or to become a philosophical Communist or a full-fledged member of the Party. No one is penalized for writing or speaking in favor of the Party or its philosophy. Also, the Act does not require or forbid anything whatever to any person merely because he is a member of, or is affiliated with, the Communist Party. It applies only to one who becomes an officer of a labor union.

I am aware that the oath is resented by many labor leaders of unquestioned loyalty and above suspicion of Communist connections, indeed by some who have themselves taken bold and difficult steps to rid the labor movement of Communists. I suppose no one likes to be compelled to exonerate himself from connections he has never

acquired. I have sometimes wondered why I must file papers showing I did not steal my car before I can get a license for it. But experience shows there are thieves among automobile drivers, and that there are Communists among labor leaders. The public welfare, in identifying both, outweighs any affront to individual dignity.

In weighing claims that any particular activity is above the reach of law, we have a high responsibility to do so in the light of present-day actualities, not nostalgic idealizations valid for a simpler age. Our own world, organized for liberty, has been forced into deadly competition with another world, organized for power. We are faced with a lawless and ruthless effort to infiltrate and disintegrate our society. In cases involving efforts of Congress to deal with this struggle we are clearly called upon to apply the long-standing rule that an appointive Judiciary should strike down no act produced by the democratic processes of our representative system unless unconstitutionality is clear and certain.

I conclude that we cannot deny Congress power to take these measures under the Commerce Clause to require labor union officers to disclose their membership in or affiliation with the Communist Party.

## III.

Congress has, however, required an additional disclaimer, which in my view does encounter serious constitutional objections. A union officer must also swear that "he does not believe in . . . the overthrow of the United States Government by force or by any illegal or unconstitutional methods." [8]

---

[8] The Act lays down other requirements for the oath which do not require extended discussion, as, for example, the clause "is not a member of or supports any organization that believes in or teaches, the overthrow of the United States Government by force." For reasons set forth in parts I and II, Congress would undoubtedly have power

If Congress has power to condition any right or privilege of an American citizen [9] upon disclosure and disavowal of belief on any subject, it is obviously this one. But the serious issue is whether Congress has power to proscribe any opinion or belief which has not manifested itself in any overt act. While the forepart of the oath requires disclosure and disavowal of relationships which depend on overt acts of membership or affiliation, the afterpart demands revelation and denial of mere beliefs or opinions, even though they may never have matured into any act whatever or even been given utterance. In fact, the oath requires one to form and express a conviction on an abstract proposition which many good citizens, if they have thought of it at all, have considered too academic and remote to bother about.

That this difference is decisive on the question of power becomes unmistakable when we consider measures of enforcement. The only sanction prescribed, and probably the only one possible in dealing with a false affidavit, is punishment for perjury. If one is accused of falsely stating that he was not a member of, or affiliated with, the Communist Party, his conviction would depend upon proof of visible and knowable overt acts or courses of conduct sufficient to establish that relationship. But if one is accused of falsely swearing that he did not believe

to require disclosure of membership in an organization which had the characteristics of the Communist Party or other characteristics of similar gravity. As drawn, this clause might, however, apply to membership in a mere philosophical or discussion group.

[9] This part of the oath was obviously intended to disclose persons not members of or affiliated with the Communist Party but who were a part of the undertow of the Communist movement. It was probably suggested by the long-standing requirement of somewhat similar oaths in immigration and naturalization matters. There is, however, no analogy between what Congress may require of aliens as a condition of admission or of citizenship and what it may require of a citizen.

something that he really did believe, the trial must revolve around the conjecture as to whether he candidly exposed his state of mind.

The law sometimes does inquire as to mental state, but only so far as I recall when it is incidental to, and determines the quality of, some overt act in question. From its circumstances, courts sometimes must decide whether an act was committed intentionally or whether its results were intended, or whether the action taken was in malice, or after deliberation, or with knowledge of certain facts. But in such cases the law pries into the mind only to determine the nature and culpability of an act, as a mitigating or aggravating circumstance, and I know of no situation in which a citizen may incur civil or criminal liability or disability because a court infers an evil mental state where no act at all has occurred.[10] Our trial processes are clumsy and unsatisfying for inferring cogitations which are incidental to actions, but they do not even pretend to ascertain the thought that has had no outward manifestation. Attempts of the courts to fathom modern political meditations of an accused would be as futile and mischievous as the efforts in the infamous heresy trials of old to fathom religious beliefs.

Our Constitution explicitly precludes punishment of the malignant mental state alone as treason, most serious of all political crimes, of which the mental state of adherence to the enemy is an essential part. It requires a duly witnessed overt act of aid and comfort to the enemy. *Cramer* v. *United States,* 325 U. S. 1. It is true that in England of olden times men were tried for treason for mental indiscretions such as imagining the death of the king. But our Constitution was intended to end such prosecutions. Only in the darkest periods of human his-

---

[10] See Holmes, *The Common Law,* Lectures II, III and IV, pp. 65–68, 132 *et seq.*

tory has any Western government concerned itself with mere belief, however eccentric or mischievous, when it has not matured into overt action; and if that practice survives anywhere, it is in the Communist countries whose philosophies we loathe.

How far we must revert toward these discredited systems if we are to sustain this oath is made vivid by the Court's reasoning that the Act applies only to those "whose beliefs strongly indicate a will to engage in political strikes . . . ." Since Congress has never outlawed the political strike itself, the Court must be holding that Congress may root out mere ideas which, even if acted upon, would not result in crime. It is a strange paradox if one may be forbidden to have an idea in mind that he is free to put into execution. But apart from this, efforts to weed erroneous beliefs from the minds of men have always been supported by the argument which the Court invokes today, that beliefs are springs to action, that evil thoughts tend to become forbidden deeds. Probably so. But if power to forbid acts includes power to forbid contemplating them, then the power of government over beliefs is as unlimited as its power over conduct and the way is open to force disclosure of attitudes on all manner of social, economic, moral and political issues.

These suggestions may be discounted as fanciful and farfetched. But we must not forget that in our country are evangelists and zealots of many different political, economic and religious persuasions whose fanatical conviction is that all thought is divinely classified into two kinds—that which is their own and that which is false and dangerous. Communists are not the only faction which would put us all in mental strait jackets. Indeed all ideological struggles, religious or political, are primarily battles for dominance over the minds of people. It is not to be supposed that the age-old readiness to

try to convert minds by pressure or suppression, instead of reason and persuasion, is extinct. Our protection against all kinds of fanatics and extremists, none of whom can be trusted with unlimited power over others, lies not in their forbearance but in the limitations of our Constitution.

It happens that the belief in overthrow of representative government by force and violence which Congress conditionally proscribes is one that I agree is erroneous. But "if there is any principle of the Constitution that more imperatively calls for attachment than any other it is the principle of free thought—not free thought for those who agree with us but freedom for the thought that we hate." Holmes, J., dissenting in *United States* v. *Schwimmer*, 279 U. S. 644, 654–55. Moreover, in judging the power to deny a privilege to think otherwise, we cannot ignore the fact that our own Government originated in revolution and is legitimate only if overthrow by force may sometimes be justified. That circumstances sometimes justify it is not Communist doctrine but an old American belief.[11]

The men who led the struggle forcibly to overthrow lawfully constituted British authority found moral support by asserting a natural law under which their revolution was justified, and they broadly proclaimed these beliefs in the document basic to our freedom. Such sentiments have also been given ardent and rather ex-

---

[11] Nothing is more pernicious than the idea that every radical measure is "Communistic" or every liberal-minded person a "Communist." One of the tragedies of our time is the confusion between reform and Communism—a confusion to which both the friends and enemies of reform have contributed, the one by failing to take a clear stand against Communists and Communism and the other by characterizing even the most moderate suggestion of reform as "Communistic" and its advocates as "Communists." Unquestioning idolatry of the *status quo* has never been an American characteristic.

travagant expression by Americans of undoubted patriotism.[12] Most of these utterances were directed against a tyranny which left no way to change by suffrage. It seems to me a perversion of their meaning to quote them, as the Communists often do, to sanction violent attacks upon a representative government which does afford such means. But while I think Congress may make it a crime

---

[12] A surprising catalogue of statements could be compiled. The following are selected from Mencken, *A New Dictionary of Quotations,* under the rubric "Revolution": "Whenever any government becomes destructive of these ends [life, liberty and the pursuit of happiness] it is the right of the people to alter or abolish it, and to institute a new government, laying its foundations on such principles, and organizing its powers in such form, as to them shall seem most likely to effect their safety and happiness." Thomas Jefferson, *The Declaration of Independence,* July 4, 1776. "The community hath an indubitable, inalienable, and indefeasible right to reform, alter or abolish government, in such manner as shall be by that community judged most conducive to the public weal." The Pennsylvania Declaration of Rights, 1776. "It is an observation of one of the profoundest inquirers into human affairs that a revolution of government is the strongest proof that can be given by a people of their virtue and good sense." John Adams, *Diary,* 1786. "What country can preserve its liberties if their rulers are not warned from time to time that their people preserve the spirit of resistance? Let them take arms." Thomas Jefferson, *Letter to W. S. Smith,* Nov. 13, 1787. "An oppressed people are authorized whenever they can to rise and break their fetters." Henry Clay, Speech in the House of Representatives, March 4, 1818. "Any people anywhere, being inclined and having the power, have the right to rise up and shake off the existing government and form a new one that suits them better." Abraham Lincoln, Speech in the House of Representatives, 1848. "All men recognize the right of revolution: that is, the right to refuse allegiance to, and to resist, the government when its tyranny or its inefficiency are great and unendurable." H. D. Thoreau, *An Essay on Civil Disobedience,* 1849. "This country, with its institutions, belongs to the people who inhabit it. Whenever they shall grow weary of the existing government they can exercise their constitutional right of amending it, or their revolutionary right to dismember or overthrow it." Abraham Lincoln, Inaugural Address, March 4, 1861. "Whenever the ends of govern-

to take one overt step to use or to incite violence or force against our Government, I do not see how in the light of our history a mere belief that one has a natural right under some circumstances to do so can subject an American citizen to prejudice any more than possession of any other erroneous belief. Can we say that men of our time must not even think about the propositions on

---

ment are perverted, and public liberty manifestly endangered, and all other means of redress are ineffectual, the people may, and of a right ought to reform the old, or establish a new government; the doctrine of non-resistance against arbitrary power and oppression is absurd, slavish and destructive of the good and happiness of mankind." Declaration of Rights of Maryland, 1867. "The right of revolution is an inherent one. When people are oppressed by their government, it is a natural right they enjoy to relieve themselves of the oppression, if they are strong enough, either by withdrawal from it, or by overthrowing it and substituting a government more acceptable." U. S. Grant, Personal Memoirs, I, 1885.

Quotations of similar statements could be multiplied indefinitely. Of course, these quotations are out of their context and out of their times. And despite their abstract theories about revolt, it should also be noted that Adams, Jefferson, Lincoln and Grant were uncompromising in putting down any show of rebellion toward the Government they headed.

The revolutionary origin of our own Government has inclined Americans to value revolution as a means to liberty and loosely to think that all revolutionists are liberals. The fact is, however, that violent revolutions are rare which do more in the long run than to overthrow one tyranny to make way for another. The cycle from revolt to reaction has taken less than a score of bloody years in the great revolutions. The Puritan Commonwealth under Cromwell led but to the Restoration; the French by revolution escaped from the reign of Louis XVI to the dictatorship of Napoleon; the Russians overthrew the Czar and won the dictatorship of Lenin and Stalin; the Germans deposed the Kaiser and fell victims of a dictatorship by Hitler. I am convinced that force and violence do not serve the cause of liberty as well as nonviolence. See Fischer, Gandhi and Stalin, passim.

But the sentiments I have quoted have strong appeal to the impetuous and are deeply imbedded in American tradition.

which our own Revolution was justified? Or may they think, provided they reach only one conclusion—and that the opposite of Mr. Jefferson's?

While the Governments, State and Federal, have expansive powers to curtail action, and some small powers to curtail speech or writing, I think neither has any power, on any pretext, directly or indirectly to attempt foreclosure of any line of thought. Our forefathers found the evils of free thinking more to be endured than the evils of inquest or suppression. They gave the status of almost absolute individual rights to the outward means of expressing belief. I cannot believe that they left open a way for legislation to embarrass or impede the mere intellectual processes by which those expressions of belief are examined and formulated. This is not only because individual thinking presents no danger to society, but because thoughtful, bold and independent minds are essential to wise and considered self-government.

Progress generally begins in skepticism about accepted truths. Intellectual freedom means the right to re-examine much that has been long taken for granted. A free man must be a reasoning man, and he must dare to doubt what a legislative or electoral majority may most passionately assert. The danger that citizens will think wrongly is serious, but less dangerous than atrophy from not thinking at all. Our Constitution relies on our electorate's complete ideological freedom to nourish independent and responsible intelligence and preserve our democracy from that submissiveness, timidity and herd-mindedness of the masses which would foster a tyranny of mediocrity. The priceless heritage of our society is the unrestricted constitutional right of each member to think as he will. Thought control is a copyright of totalitarianism, and we have no claim to it. It is not the function of our Government to keep the citizen from falling into error; it is the function of the

citizen to keep the Government from falling into error. We could justify any censorship only when the censors are better shielded against error than the censored.

The idea that a Constitution should protect individual nonconformity is essentially American and is the last thing in the world that Communists will tolerate. Nothing exceeds the bitterness of their demands for freedom for themselves in this country except the bitterness of their intolerance of freedom for others where they are in power.[13] An exaction of some profession of belief or nonbelief is precisely what the Communists would enact—each individual must adopt the ideas that are common to the ruling group. Their whole philosophy is to minimize man as an individual and to increase the power of man acting in the mass. If any single characteristic distinguishes our democracy from Communism it is our recognition of the individual as a personality rather than as a soulless part in the jigsaw puzzle that is the collectivist state.

I adhere to views I have heretofore expressed, whether the Court agreed, *West Virginia Board of Education* v. *Barnette,* 319 U. S. 624, or disagreed, see dissenting opinion in *United States* v. *Ballard,* 322 U. S. 78, 92, that our Constitution excludes both general and local governments from the realm of opinions and ideas, beliefs and doubts, heresy and orthodoxy, political, religious or scientific. The right to speak out, or to publish, also

---

[13] Prime Minister Attlee recently stated: "I constantly get hypocritical resolutions protesting against alleged infringements of freedom in this country. I get protests because we keep out from places where secret work is carried on people who cannot be trusted. This from Communists who know that their fellows in Communist countries carry on a constant purge and ruthlessly remove from office anyone who shows the slightest sign of deviating from what their rulers consider to be orthodoxy. It is sickening hypocrisy." London Times Weekly Edition, July 6, 1949.

is protected when it does not clearly and presently threaten some injury to society which the Government has a right to protect. Separate opinion, *Thomas* v. *Collins,* 323 U. S. 516. But I have protested the degradation of these constitutional liberties to immunize and approve mob movements, whether those mobs be religious or political, radical or conservative, liberal or illiberal, *Douglas* v. *City of Jeannette,* 319 U. S. 157; *Terminiello* v. *Chicago,* 337 U. S. 1, 13, or to authorize pressure groups to use amplifying devices to drown out the natural voice and destroy the peace of other individuals. *Saia* v. *People of New York,* 334 U. S. 558; *Kovacs* v. *Cooper,* 336 U. S. 77. And I have pointed out that men cannot enjoy their right to personal freedom if fanatical masses, whatever their mission, can strangle individual thoughts and invade personal privacy. *Martin* v. *Struthers,* 319 U. S. 141, dissent at 166. A catalogue of rights was placed in our Constitution, in my view, to protect the individual in his individuality, and neither statutes which put those rights at the mercy of officials nor judicial decisions which put them at the mercy of the mob are consistent with its text or its spirit.

I think that under our system, it is time enough for the law to lay hold of the citizen when he acts illegally, or in some rare circumstances when his thoughts are given illegal utterance. I think we must let his mind alone.[14]

---

[14] The Court appears to recognize and compound the constitutional weakness of this statute and, to save this part of the oath from unconstitutionality, declines to read the text "very literally." It renders the Act to call for disclaimer of belief in forcible overthrow only as an objective but not as a prophecy. And furthermore, one is allowed to believe in forcible overthrow, even as an objective, so long as the belief does not relate to the Government "as it now exists." I think we do not make an Act constitutional by making it vague but only compound its invalidity. *Cf. Winters* v. *New York,* 333 U. S. 507.

## IV.

The task of this Court to maintain a balance between liberty and authority is never done, because new conditions today upset the equilibriums of yesterday. The seesaw between freedom and power makes up most of the history of governments, which, as Bryce points out, on a long view consists of repeating a painful cycle from anarchy to tyranny and back again. The Court's day-to-day task is to reject as false, claims in the name of civil liberty which, if granted, would paralyze or impair authority to defend existence of our society, and to reject as false, claims in the name of security which would undermine our freedoms and open the way to oppression. These are the competing considerations involved in judging any measures which government may take to suppress or disadvantage its opponents and critics.

I conclude that today's task can only be discharged by holding that all parts of this oath which require disclosure of overt acts of affiliation or membership in the Communist Party are within the competence of Congress to enact and that any parts of it that call for a disclosure of belief unconnected with any overt act are beyond its power.[15]

MR. JUSTICE BLACK, dissenting.

We have said that "Freedom to think is absolute of its own nature; the most tyrannical government is powerless to control the inward workings of the mind."[1] But people can be, and in less democratic countries have

---

[15] This conclusion, if it prevailed, would require decision of the effect of partial invalidity on the whole and the applicability of the severability clause. As it does not prevail, discussion of the question would be academic.

[1] Dissenting opinion in *Jones* v. *Opelika,* 316 U. S. 584, 618, adopted as the Court's opinion in 319 U. S. 103. See also *Cantwell* v. *Connecticut,* 310 U. S. 296, 303.

been, made to suffer for their admitted or conjectured thoughts. Blackstone recalls that Dionysius is "recorded to have executed a subject, barely for dreaming that he had killed him; which was held for a sufficient proof, that he had thought thereof in his waking hours." [2] Such a result, while too barbaric to be tolerated in our nation, is not illogical if a government can tamper in the realm of thought and penalize "belief" on the ground that it might lead to illegal conduct. Individual freedom and governmental thought-probing cannot live together. As the Court admits even today, under the First Amendment "Beliefs are inviolate."

Today's decision rejects that fundamental principle. The Court admits, as it must, that the "proscriptions" of § 9 (h) of the National Labor Relations Act as amended by the Taft-Hartley Act rest on "beliefs and political affiliations," and that "Congress has undeniably discouraged the lawful exercise of political freedoms" which are "protected by the First Amendment." These inescapable facts should compel a holding that § 9 (h) conflicts with the First Amendment.

Crucial to the Court's contrary holding is the premise that congressional power to regulate trade and traffic includes power to proscribe "beliefs and political affiliations." No case cited by the Court provides the least vestige of support for thus holding that the Commerce Clause restricts the right to think. On the contrary, the First Amendment was added after adoption of the Constitution for the express purpose of barring Congress from using previously granted powers to abridge belief or its expression. Freedom to think is inevitably abridged when beliefs are penalized by imposition of civil disabilities.

Since § 9 (h) was passed to exclude certain beliefs from one arena of the national economy, it was quite natural

---

[2] 4 Blackstone, Commentaries 79 (6th ed. Dublin 1775).

to utilize the test oath as a weapon. History attests the efficacy of that instrument for inflicting penalties and disabilities on obnoxious minorities. It was one of the major devices used against the Huguenots in France, and against "heretics" during the Spanish Inquisition. It helped English rulers identify and outlaw Catholics, Quakers, Baptists, and Congregationalists—groups considered dangerous for political as well as religious reasons.[3] And wherever the test oath was in vogue, spies and informers found rewards far more tempting than truth.[4] Painful awareness of the evils of thought espionage made

[3] The increasing restrictions and punishment imposed on these groups are shown by the following examples. In 1558 Parliament prescribed an oath, which no conscientious Catholic could take, for all judges, ecclesiastical ministers, those receiving pay from the Queen, and those taking university degrees; four years later the oath was extended to schoolmasters, lawyers, sheriffs, and court officers. In 1593 all Protestants were required to attend Anglican services and forbidden to hold nonconformist religious meetings. And Catholics convicted of failing to attend Anglican services regularly were restricted to within five miles of their dwellings. In 1609 such Catholics were barred even from serving as executors, guardians, physicians, or apothecaries, and their right to prosecute suits in court was practically abolished; it was also made treason to be converted or convert anyone else to Catholicism. Between 1661 and 1677, Parliament outlawed attendance at any non-Anglican religious services, and required those holding civil, military, or municipal office to subscribe to an oath which effectively barred Catholics and non-Anglican Protestants. Punishment for violations of these and the many similar statutes ranged from fines and imprisonment to exile and death. See, e. g., 1 Eliz. c. 1; 5 Eliz. c. 1; 35 Eliz. cc. 1, 2; 3 Jac. I cc. 4, 5; 7 Jac. I cc. 2, 6; 13 Car. II Stat. 2, c. 1; 13 & 14 Car. II cc. 1, 4, 33; 22 Car. II c. 1; 25 Car. II c. 2; 30 Car. II Stat. 2.

As for the political motivations and objectives of these statutes, see, e. g., the declaration of purpose in 35 Eliz. c. 2, quoted in note 7 infra.

[4] Under the Stuart monarchs in England it was standard practice to give an informer one-third of the fines collected from his victim. E. g., 3 Jac. I c. 5. And a few were sufficiently daring and un-

such oaths "an abomination to the founders of this nation," *In re Summers,* 325 U. S. 561, 576, dissenting opinion. Whether religious, political, or both, test oaths are implacable foes of free thought. By approving their imposition, this Court has injected compromise into a field where the First Amendment forbids compromise.

The Court assures us that today's encroachment on liberty is just a small one, that this particular statutory provision "touches only a relative handful of persons, leaving the great majority of persons of the identified affiliations and beliefs completely free from restraint." But not the least of the virtues of the First Amendment is its protection of each member of the smallest and most unorthodox minority. Centuries of experience testify that laws aimed at one political or religious group, however rational these laws may be in their beginnings, generate hatreds and prejudices which rapidly spread beyond control. Too often it is fear which inspires such passions, and nothing is more reckless or contagious. In the resulting hysteria, popular indignation tars with the same brush

---

scrupulous to obtain the more satisfying reward of fame. A notorious example took place in England during the reign of Charles II:

"The political atmosphere was electric. . . . Thus it is not strange that when Titus Oates, an Anglican clergyman who had been reconciled the year before to Rome, came forward in August, 1678, to denounce a vast Jesuit conspiracy against the King's life and the Protestant religion, his tale of wild lies met with a degree of credence that later ages would perhaps have refused to it. . . . The Pope, he declared, had commanded, and the Jesuits undertaken, a conquest of the kingdom; . . . . In all the arrangements he had been, he said, a trusted emissary . . . . Over a hundred conspirators, mostly Jesuits, were mentioned by name . . . . Oates was examined at the Council Board. The King caught him lying, but the extent and gravity of his charges demanded investigation; . . . . In one important point Oates' story was confirmed. . . . There was no 'plot' in Oates' sense; but there was quite enough of plotting to cost men their heads under the English law of treason . . . ." 5 Cambridge Modern History 220–221.

all those who have ever been associated with any member of the group under attack or who hold a view which, though supported by revered Americans as essential to democracy, has been adopted by that group for its own purposes.

Under such circumstances, restrictions imposed on proscribed groups are seldom static,[5] even though the rate of expansion may not move in geometric progression from discrimination to arm-band to ghetto and worse. Thus I cannot regard the Court's holding as one which merely bars Communists from holding union office and nothing more. For its reasoning would apply just as forcibly to statutes barring Communists and their suspected sympathizers from election to political·office, mere membership in unions, and in fact from getting or holding any jobs whereby they could earn a living.

The Court finds comfort in its assurance that we need not fear too much legislative restriction of political belief or association "while this Court sits." That expression, while felicitous, has no validity in this particular constitutional field. For it springs from the assumption that individual mental freedom can be constitutionally abridged whenever any majority of this Court finds a satisfactory legislative reason. Never before has this Court held that the Government could for any reason attaint persons for their political beliefs or affiliations. It does so today.

Today the "political affiliation" happens to be the Communist Party: testimony of an ex-Communist that some Communist union officers had called "political

---

[5] See note 3 *supra*. And see the comment on such legislation in 2 Hallam, The Constitutional History of England 473 (London, 1829): "It is the natural consequence of restrictive laws to aggravate the disaffection which has served as their pretext; and thus to create a necessity for a legislature that will not retrace its steps, to pass still onward in the course of severity."

strikes" is held sufficient to uphold a law coercing union members not to elect any Communist as an officer. Under this reasoning, affiliations with other political parties could be proscribed just as validly. Of course there is no practical possibility that either major political party would turn this weapon on the other, even though members of one party were accused of "political lockouts" a few years ago and members of the other are now charged with fostering a "welfare state" alien to our system. But with minor parties the possibility is not wholly fanciful. One, for instance, advocates socialism; [6] another allegedly follows the Communist "line"; still another is repeatedly charged with a desire and purpose to deprive Negroes of equal job opportunities. Under today's opinion Congress could validly bar all members of these parties from officership in unions or industrial corporations; the only showing required would be testimony that some members in such positions had, by attempts to further their party's purposes, unjustifiably fostered industrial strife which hampered interstate commerce.

It is indicated, although the opinion is not thus limited and is based on threats to commerce rather than to national security, that members of the Communist Party or its "affiliates" can be individually attainted without danger to others because there is some evidence that as a group they act in obedience to the commands of a foreign power. This was the precise reason given in Sixteenth-Century England for attainting all Catholics unless they subscribed to test oaths wholly incompatible with their

---

[6] Proscriptions based on affiliation with the Socialist Party are not unprecedented. In 1920 the New York Assembly, upon allegations that the party was disloyal, suspended five legislators elected on the Socialist ticket. The vigorous protests of a Bar Association committee headed by Charles Evans Hughes, later Chief Justice of this Court, were of no avail. See John Lord O'Brian, Loyalty Tests and Guilt by Association, 61 Harv. L. Rev. 592, 593.

religion.[7]  Yet in the hour of crisis, an overwhelming majority of the English Catholics thus persecuted rallied loyally to defend their homeland against Spain and its Catholic troops.[8]  And in our own country Jefferson and his followers were earnestly accused of subversive allegiance to France.[9]  At the time, imposition of civil disability on all members of his political party must have seemed at least as desirable as does § 9 (h) today.  For at stake, so many believed, was the survival of a newly-founded nation, not merely a few potential interruptions of commerce by strikes "political" rather than economic in origin.

---

[7] 35 Eliz. c. 2, for example, was aimed at "sundry wicked and seditious Persons, who terming themselves Catholicks, and being indeed Spies and Intelligencers, . . . and hiding their most detestable and devilish Purposes under a false Pretext of Religion and Conscience, do secretly wander and shift from Place to Place within this Realm, to corrupt and seduce her Majesty's Subjects, and to stir them to Sedition and Rebellion."

[8] As is evidenced by the statute quoted in note 7 *supra*, the test oaths, the drastic restrictions and the punishment imposed on Catholics were "based on the assumption that all Catholics were politically hostile to the Queen, and were at one with Allen and the Jesuits in seeking her deposition and the conquest of the country by Spain. The patriotic action of the Catholics at home through the crisis of the Spanish Armada proved the weakness of this assumption.  In the hour of peril the English Catholics placed loyalty to their Queen and country before all other considerations. . . .  The injustice of imputing treachery to the whole Catholic population was proved beyond question."  3 Cambridge Modern History 351.

[9] Castigating Jefferson and his followers as "jacobins," a "French faction" guilty of "subversion," Fisher Ames warned: "[T]he jacobins have at last made their own discipline perfect: they are trained, officered, regimented and formed to subordination, in a manner that our militia have never yet equalled. . . . [A]nd it is as certain as any future event can be, that they will take arms against the laws as soon as they dare . . . ."  Ames, Laocoon, printed in Works of Fisher Ames 94, 101, 106 (Boston, 1809).

These experiences underline the wisdom of the basic constitutional precept that penalties should be imposed only for a person's own conduct, not for his beliefs or for the conduct of others with whom he may associate. Guilt should not be imputed solely from association or affiliation with political parties or any other organization, however much we abhor the ideas which they advocate. *Schneiderman* v. *United States,* 320 U. S. 118, 136–139.[10] Like anyone else, individual Communists who commit overt acts in violation of valid laws can and should be punished. But the postulate of the First Amendment is that our free institutions can be maintained without proscribing or penalizing political belief, speech, press, assembly, or party affiliation.[11] This is a far bolder philosophy

---

[10] And see, *e. g.,* John Lord O'Brian, Loyalty Tests and Guilt by Association, 61 Harv. L. Rev. 592. That article quotes the following from a Memorial submitted to the New York Assembly by a special committee of the Bar Association of the City of New York protesting the suspension of five Socialist legislators: "it is of the essence of the institutions of liberty that it be recognized that guilt is personal and cannot be attributed to the holding of opinion or to mere intent in the absence of overt acts . . . ." O'Brian points out that this Memorial was "largely written by" Charles Evans Hughes. *Id.* at 594.

[11] "If there be any among us who would wish to dissolve this Union or to change its republican form, let them stand undisturbed as monuments of the safety with which error of opinion may be tolerated where reason is left free to combat it. I know, indeed, that some honest men fear that a republican government cannot be strong; that this government is not strong enough. But would the honest patriot, in the full tide of successful experiment, abandon a government which has so far kept us free and firm, on the theoretic and visionary fear that this government, the world's best hope, may by possibility want energy to preserve itself?" Thomas Jefferson, First Inaugural Address, March 4, 1801. This address, along with other writings on freedoms guaranteed by the First Amendment, is reprinted in Jones, Primer of Intellectual Freedom 142 (Harvard University Press, 1949).

than despotic rulers can afford to follow. It is the heart of the system on which our freedom depends.

Fears of alien ideologies have frequently agitated the nation and inspired legislation aimed at suppressing advocacy of those ideologies.[12] At such times the fog of public excitement obscures the ancient landmarks set up in our Bill of Rights. Yet then, of all times, should this Court adhere most closely to the course they mark. This was done in *De Jonge* v. *Oregon,* 299 U. S. 353, 365, where the Court struck down a state statute making it a crime to participate in a meeting conducted by Communists. It had been stipulated that the Communist Party advocated violent overthrow of the Government. Speaking through Chief Justice Hughes, a unanimous Court calmly announced time-honored principles that should govern this Court today: "The greater the importance of safeguarding the community from incitements to the overthrow of our institutions by force and violence, the more imperative is the need to preserve inviolate the constitutional rights of free speech, free press and free assembly in order to maintain the opportunity for free political discussion, to the end that government may be responsive to the will of the people and that changes, if desired, may be obtained by peaceful means. Therein lies the security of the Republic, the very foundation of constitutional government."

---

[12] For discussion of early American models, the Alien and Sedition Acts, see Bowers, Jefferson and Hamilton, 1925, c. XVI, "Hysterics," and c. XVII, "The Reign of Terror"; 1 Morison, Life of Otis, c. VIII, "A System of Terror."