J-A06004-21

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

| | | |
|---|---|---|
| K.G. | : | IN THE SUPERIOR COURT OF |
| | : | PENNSYLVANIA |
| Appellant | : | |
| | : | |
| | : | |
| v. | : | |
| | : | |
| | : | |
| M.T.W. | : | No. 1034 WDA 2020 |

Appeal from the Order Entered September 1, 2020
In the Court of Common Pleas of Blair County Orphans' Court at No(s):
No. 2008 GN 4281

BEFORE:  BENDER, P.J.E., LAZARUS, J., and McCAFFERY, J.

MEMORANDUM BY BENDER, P.J.E.:          **FILED:  June 9, 2021**

K.G. (Mother) appeals from the custody order, dated August 26, 2020, and entered on September 1, 2020, directing that M.T.W. (Father) continues to have primary physical custody of the parties' son, J.W. (Child), born in February of 2005, with Mother having custody one weekend per month, with a summer schedule granting two-week periods of custody to each parent on a rotating schedule.[1]  After extensive review, we affirm.

In an opinion and order, dated April 14, 2020, the trial court provided a brief overview of this matter, stating:

> The [p]arties were married in August 2004 and resided together in Virginia until separation, which occurred immediately after [Child] was born.  Mother relocated back to Pennsylvania with [Child], and the [p]arties divorced in June 2006.

---

[1] The parties share legal custody of Child.

This case was both lengthy and complex. This [c]ourt had conducted a previous [e]videntiary [h]earing in this matter and issued an [o]rder dated October 12, 2010.

The [c]ourt conducted six [c]ustody [e]videntiary [h]earings, July 18, 2018, July 19, 2018, October 29, 2018, March 29, 2019, October 4, 2019[,] and January 27, 2020, along with several [s]pecial [r]elief and [c]ontempt hearings. There was a [c]ustody [e]valuation completed by Dr. Arnold Shienvold for this matter…. The [c]ourt was also able to review the [c]hild [c]ustody [e]valuation completed by Dr. Marolyn Morford on August 3, 2010, which was entered as an [e]xhibit for this matter. Mid[-]way through the case, the [c]ourt appointed a [g]uardian *ad litem*, Attorney Suzanne Bigelow-Cherry, to assist with this matter.

Trial Court Opinion (TCO 4/14/20), 4/14/2020, at 1-2.

The rest of the court's thirty-five-page opinion includes extensive discussion about the testimony of Father, Mother, and Dr. Shienvold. It also provides information about Dr. Morford's and the guardian *ad litem*'s reports. The opinion additionally contains the following discussion in reference to Child's allegations that Father had sexually abused him:

This issue is an essential matter in this case that needs to be addressed separately. The allegations in the Louden County, Virginia Child Protective Services records indicate that [Child] alleged that Father had touched [Child's] penis over his clothing in bed and continued after [Child] tried to roll away. [Child] also alleged that Father would hit him on the head out of anger. The alleged head[-]hitting last occurred in November 2017. The touching allegedly last happened one year ago. The [r]eport further indicates that although [Child] disclosed during the forensic interview, the disclosures were vague in details, which led to concerns about credibility. Furthermore, the criminal case that was considered had been closed without charges being pursued.

The [c]ourt has already made the finding that the sexual abuse did not occur[] and cites the following as the basis for that decision.

1. The Commonwealth of Virginia, utilizing a standard of preponderance of the evidence (not clear and convincing as in Pennsylvania) found that the allegation was not supported.

2. The [C]hild was under specific[,] undue influence of both Mother and Mr. Confer[2] at the time the [Child] made the disclosure. The Western Psychiatric Hospital reports (completed after the alleged abuse occurred, but before [Child] disclosed) reveals [Child] expressed a deep concern for his and his Mother's safety from Mr. Confer. During this time at UPMC Western Psychiatric, there was no indication by the [C]hild of any improper conduct by Father.

3. Mother allowed Mr. Confer to take the [C]hild to Nevada for a week. It was after this week with Mr. Confer that the [C]hild returned to Blair County, and his position suddenly reversed regarding [r]elocation [to Nevada], and allegations against Father surfaced.

4. Dr. Shienvold's evaluation indicated that [Child] expressed his desire to live with Father in the fall of 2017[.] [Child] made the allegations against Father in February 2018, which allegedly occurred prior to [the f]all of 2017. Dr. Shienvold also states in his [r]eport that [Child's] allegations changed, where in the first interview, [Child] said that the [abuse] occurred from the time [Child] was nine years old [and continued] until he was eleven and a half, and during the second interview, [Child] stated that it began when [Child was four years old [and continued] until he was ten.

5. Finally, the [c]ourt does not believe the accusations based on the assignment of credibility. In this event, Father's denials were accepted and believed, while both [Child's] and Mother's statements that the above occurred[] had little credibility. In fact, the [c]ourt rejected these allegations early, based on all of the above factors. It was important to note this [c]ourt had the advantage of conducting the custody evidentiary hearing in

---

[2] Mr. Confer and Mother were in a relationship during 2017 and married on December 22, 2017. This was Mother's fourth marriage. Mother filed a petition to relocate to Nevada, Mr. Confer's state of residence, in January 2018; however, at the October 2018 hearing, she testified that she no longer intended to relocate, and that Mr. Confer had filed for divorce.

2010 and several intervening hearings. This [c]ourt, who[se] 2010 [o]rder provided Mother with primary custody, has had multiple opportunities to weigh on the [p]arties' credibility.

*Id.* at 18-20 (citations to the record omitted).

In addition, the trial court considered all sixteen factors that are set forth at 23 Pa.C.S. § 5328(a). The court's opinion provides the following information:

(1)     CONTINUING CONTACT: Which party is more likely to encourage or promote continuing contact with the other [p]arty.

Mother[] … has been one to do the exact opposite[,] in that she has not been supportive of Father's visits with their son[] and[,] in fact, [has been] undermining to those visits. Mother did not support the supervised visits as discussed in the [o]pinion and [the] supervisor refused to continue, partially based upon Mother's conduct. Father, on the other hand[,] has always established a willingness to allow Mother to play a role in their son's life. Father is much more likely to encourage and promote continuing contact with Mother. This is a major advantage to Father.

(2)     CONSIDERATION OF ABUSE: The present and past abuse committed by a party or member of party's household and which party can provide adequate physical safeguards and supervision.

While there were allegations of inappropriate conduct by Father towards [Child], this [c]ourt along with every other fact-finding agency has not supported those accusations. The [c]ourt has expressed its strong belief that these allegations did not occur and[,] therefore[,] this was an equal factor.

(3)     PARENTING: Parental duties performed by each party.

This favors Mother as she has done these duties for a longer period. It appears that Father has the ability to perform these duties if given the opportunity.

- 4 -

(4)  STABILITY & CONTINUITY: The need for stability and continuity of children's education, family life and community life.

This factor again strongly favors Father.  Any stability Mother would achieve would be in the Blair County life that she provided for [Child;] however[,] she was willing to give up that stability with her short[-]lived marriage to Mr. Confer, and her Petition to Relocate to Nevada.  Based on both Dr. Shienvold['s] and Dr. Morford's reports, Mother does not understand the consequences her decisions have on the [C]hild's stability.  The [c]ourt believes Father can provide better stability if given the chance.

(5)  FAMILY: The availability of extended family.

This is an equal factor in that both have extended families willing to provide assistance.

(6)  SIBLINGS: The child's sibling relationships.

[Child] has a younger ½ sibling.  The [c]ourt believes that this relationship should continue[;] however[,] it is not dispositive in any way.  Any [o]rder would encourage that contact.  The [c]ourt notes that residential custody of this sibling was placed with his Father.

(7)  CHILD PREFERENCE: The preference of the child.

[Child] has provided a strong presence [*sic*] to remain with his Mother.

(8)  PARTY RELATIONSHIP: The attempts of a parent to turn a child against the other parent.

This again favors Father for the reasons put out in factor number one.  Mother appears to have made a concentrated effort to impact their [C]hild's relationship with his Father.

(9)  RELATIONSHIP WITH PARENT: Which party is more likely to maintain a loving, stable[,] consistent, and nurturing relationship.

This factor again favors Father.  The custody evaluations completed by Dr. Shienvold and Dr. Morford state[] that

- 5 -

Mother's emotional instability prevents her from providing a stable and consistent relationship. Mother fails to understand that a relationship with both parents will be a positive benefit to their son.

(10) DAILY NEEDS: Which party is more likely to meet the daily needs of the child, including the physical, emotional, developmental, educational, and special needs.

Mother has been providing these for a substantial period of time[,] based on the accusations against Father. She has provided for the education[al] needs of their son, however the emotional needs of this [C]hild have been severely undercut based on Mother's failure to understand the [C]hild's need for emotional stability, and that his relationship with his Father can be positive for all involved.

(11) PROXIMITY: The proximity of residences of the parties.

Mother resides in Blair County, Pennsylvania, and Father resides in Virginia. This is an approximate three[-]hour drive. This distance prevents any shared residential custody.

(12) AVAILABILITY OF CARE: The availability to care for the child or make reasonable daycare arrangements.

Both [p]arties can equally provide for this factor.

(13) PARTY COOPERATION: The level of conflict between parties and willingness to cooperate.

Based on the past several years with allegations, the level of conflict is high. Mother continually undermines Father, and Father appears at times to be fixated at having the unfounded allegation of abuse withdrawn by [Child], which has not occurred.

(14) DRUG/ALCOHOL ABUSE: The history of drug or alcohol abuse.

The record discloses no credible findings in this matter.

(15) MENTAL/PHYSICAL HEALTH: The mental and physical condition of a party or member of the party's household.

[Child's] mental health is a major part of the record[,] as disclosed by his hospitalizations at the UPMC Crisis and the Western Psychiatric Hospital in Pittsburgh. [Child] needs a serious trauma counselor, and that will be addressed in the [o]rder.

(16) CATCHALL: Any other relevant factor.

TCO 4/14/20 at 23-28.

In response to factor (16), the court discussed various options suggested by Dr. Shienvold that it could implement in its new custody order. One of Dr. Shienvold's suggested options was for the parties to attend a reunification camp in the summer of 2019, at which Mother and Father would learn to co-parent. Mother, Father, and Child attended the camp. Testimony revealed that during sessions Mother called Father names, such as "Nassar" and "Sandusky." Other testimony revealed that Mother texted 19 people, parents of Child's friends, indicating that Father was a pedophile and that they were in a prison camp. Finally, the court concluded by stating the following:

The [c]ourt found Father substantially more credible than Mother throughout this testimony.

Dr. Shienvold found Mother was not encouraging of the [f]ather/[s]on relationship. He agreed with Dr. Morford that Mother was not allowing [Child] to develop a healthy relationship with his Father. Currently[,] Mother doesn't feel her son should spend any time with his Father.

Again, Dr. Shienvold agreed with Dr. Morford when he state[d] the following:

[]What [Mother] fails to understand and/or accept is that she has helped to create this overall situation for [Child] from the time he was a baby. As noted by Dr. Morford, [Mother] was unable to let go and allow [Child] to form independent attachments with his [F]ather. It is clear

- 7 -

that they have become e[n]meshed in their emotions. [Child's] use of the pronouns *we* and *us* when discussing reactions to various aspects of the litigation is a clear example of this e[n]meshment. A consequence of the enmeshment is that [Child], in fact, feels incredible anxiety, fear[,] and emotional pain when he thinks about being separated from his [M]other. A clear example of his anxiety and fear was apparent in his initial reaction to the fact that [Mother] and [Mr. Confer] were going to marry. His mental status deteriorated so much that he needed to be placed in the hospital. The hospital notes clearly indicate that [Child's] greatest upset at the time was the relationship between his [M]other and Mr. Confer. There was no indication that his relationship with his [F]ather was a source of concern.

Unfortunately, the way that [Child] ultimately resolved the conflict he was experiencing over his relationship with [Mother] was to fuse with her, totally align with her and [Mr. Confer], and distance himself from his [F]ather. Rather than helping [Child] work through his anxiety in a healthy manner, [Mother] consistently encouraged or pushed the relationship between [Mr. Confer] and [Child] to the point of it being more important than the relationship of [Child] with his [Father]. Her approach in this situation serves as another example of how [Mother] puts little emphasis on the importance of the father-son relationship.

On the other hand, there has been no similar set of behaviors by [Father] that show him to not be encouraging of [Child's] relationship with [Mother]. [Father] has certainly engaged in litigation to secure his continuing contact with [Child] and to [e]nsure his role as [Child's] father, but generally his actions have been responses to [Mother's] decisions. For example, in 2010 when [Father] sued for custody, [Mother] had just ended her relationship with Mr. Waite, a man who she previously had wanted [Child] to call "dad." Furthermore, after his separation from [Mother], Mr. Waite told [Father] that [Mother] was actively trying to undermine his relationship with [Child].[]

This [c]ourt finds this has clearly been a traumatic experience for all of the [p]arties[] but[,] as stated earlier, [Child's] best times were before the introduction of Mr. Confer into his life, when Father and he experienced a healthy relationship. The [c]ourt's incremental efforts to attempt to return to that relationship is reflected in the attached [o]rder.

The [c]ourt will seriously consider the return of [Child] to Mother for the commencement of the 2020/2021 school year, but if and only if [Child] utilizes the next 60 days to develop an improved relationship with his Father. To that end, Mother shall not have any contact with [Child] during that period.

TCO 4/14/20 at 34-35 (citations to the record omitted; emphasis in original).

The order issued on May 8, 2020, that accompanied the April 14, 2020 opinion, directed that:

Temporary Residential Custody shall be transferred to Father beginning on May 22, 2020. [Child] shall continue to reside with [] [F]ather until a review hearing, which will be scheduled in approximately sixty (60) days after May 22, 2020. At that time, based on the good faith efforts made by all [p]arties towards establishing an improved relationship between Father and [Child], along with the [c]ounseling reports, this [c]ourt will determine the remainder of the summer schedule. Mother shall have no contact of any sort with [Child] during this period of Father's custody.

Order, 5/8/2020, at 2 ¶3. The May 8, 2020 order also included the statement that "[t]his shall be construed as a final [o]rder, and not interlocutory, and either [p]arty may appeal this [o]rder." *Id.* at 5 ¶ 9.

Mother filed a timely appeal from the May 8th order. This Court issued a rule to show cause questioning the finality of the order. Following responses from the parties, this Court discharged the rule to show cause, but noted that the panel of judges could revisit the finality issue. Thereafter, Mother requested an extension of time to file her brief. She was directed to file her

late brief by August 14, 2020, or the appeal would be dismissed. Rather than file a brief, Mother submitted an application to discontinue the appeal on August 13, 2020. In response, this Court ordered that the appeal be dismissed for failure to file a late brief and denied as moot Mother's application for discontinuance. *See* Superior Court Order, 8/20/2020.

The next hearing took place on July 31, 2020, and was summarized by the trial court in its opinion, dated August 25, 2020, as follows:

> This [c]ourt heard testimony from Mother, Father[,] and Dr. Edward Farber at the July 31, 2020 hearing. The purpose of the [h]earing was to determine what progress has been made in [Child's] relationship with his Father and [to] receive a summary from his counselor, Dr. Edward Farber.
>
> Father testified his relationship with [Child] had improved[;] however[,] there is significant opportunity for additional improvement. Based on [Child's] repeated statements that he wanted to be in Altoona with his girlfriend, friends[,] and activities, Father, with the guidance of Dr. Farber[,] brought [Child] to Blair County several times during the two months since the [t]ransfer on May 22, 2020 to Father.
>
> These visits allowed [Child] to participate in familiar activities, which [Child] had indicated were important to him. Further, Father integrated [Child] to the extent [Child] would cooperate with activities in the area where Father resides.
>
> Dr. Farber has seen [Child] regularly during the past two months. The [c]ourt found Dr. Farber very qualified and credible.
>
> Most interestingly, Dr. Farber noted [Child] told him he had to choose one parent over the other. Dr. Farber indicated the history of litigation has been a burden for [Child]. Dr Farber found no safety concerns of [Child's] being with his Father.

Trial Court Opinion (TCO 8/26/20), 8/26/2020, at 2-3 (citations to the record omitted).

The trial court's August 26, 2020 opinion and order, from which Mother is now appealing, also discussed the federal lawsuit served on Father two days prior to the start of the two-month period that Child would be in Father's sole custody. The lawsuit was filed by Child's maternal grandmother, who supported Mother and accompanied her throughout this litigation. Child had signed the verification on May 19, 2020, a date when Child was in Mother's custody. The court concluded that this was a "final late effort to interfere with Father's efforts to rebuild his relationship with his son." *Id.* at 3. Although the lawsuit was withdrawn around the time of the July 31, 2020 hearing, the court concluded that "the lawsuit was confirmation of the findings of Dr. Shienvold and Dr. Morford, and convinces the [c]ourt that to allow [Child] to return to his Mother's care, custody[,] and influence would undo any progress which has been recently accomplished." *Id.* at 4. Lastly, the court incorporated its April 14, 2020 opinion and order and its analysis of the custody factors into the opinion and order now on appeal. Specifically, the order accompanying the August 26, 2020 opinion directed that Father was to continue having primary physical custody of Child during the school year, with Mother to have one weekend a month. The order also provided that each parent would have two-week custody periods on a rotating schedule during the summer.

Mother filed a timely notice of appeal and a concise statement of errors complained of on appeal. Her statement contains twelve issues, the first

eleven of which essentially mirror those raised in her prior appeal that arose from the April 14, 2020 and May 8, 2020 orders. Only the twelfth issue was not contained in her prior statement. In response, Father filed a motion to quash Mother's appeal, contending that because the first eleven issues she raises were the same as those in her prior appeal, this Court should dismiss that portion of her appeal due to our prior order dismissing Mother's first appeal for failure to file a brief.

In response, on October 11, 2020, this Court issued an order denying Father's motion to quash without prejudice to his right to raise this argument in his brief, which he did in the fifth issue contained in his brief. Accordingly, we initially address the subject of the appealability of the May 8, 2020 order, which the trial court states "is supplemental to this court[']s prior opinion and order dated April 14, 2020." Trial Court Order, 8/26/20, at ¶12. To make this determination, we are guided by the following:

> Generally, "a custody order will be considered final and appealable only after the trial court has completed its hearings on the merits and the resultant order resolves the pending custody claims between the parties." *G.B. v. M.M.B.*, … 670 A.2d 714, 715 ([Pa. Super.] 1996) (quashing appeal as interlocutory where order allowing father partial custody pending completion of hearings contemplated additional hearing on ultimate issues in the case). In the context of finality of orders, we recognize the uniqueness of custody orders compared to orders in other civil actions. *Id.* 670 A.2d at 718 n.9.
>
> > Child custody orders are temporary in nature and always subject to change if new circumstances affect the welfare of a child. The Commonwealth has a duty of paramount importance, to protect the child's best

- 12 -

> interests and welfare. To that end, it may always entertain an application for modification and adjustment of custodial rights.

*Id.* (citations omitted).

***Kassam v. Kassam***, 811 A.2d 1023, 1025 (Pa. Super. 2002). The ***Kassam*** decision also included the following from the ***G.B.*** opinion in which this Court held that "a custody order will be considered final and appealable only if it is both: 1) entered after the court has completed its hearings on the merits; and 2) intended by the court to constitute a complete resolution of the custody claims pending between the parties." ***Kassam***, 811 A.2d at 1027 (quoting ***G.B.***, 670 A.2d at 720). The ***Kassam*** case further explained that "[o]ur holding also serves to uphold the integrity of the trial process by not interfering with the trial court's efforts to craft a final decision and by not permitting premature challenges to those efforts." *Id.* at 1028 (quoting ***G.B.***, 670 A.2d at 721).

Although we recognize that, in the May 8, 2020 order, the trial court stated that the parties should construe that order as a final order from which either party could appeal, it also informed the parties that a review hearing would be scheduled in approximately sixty days, essentially to determine whether Child would return to Mother's custody for the 2020/2021 school year or remain with Father. Therefore, we must conclude that the May 8, 2020 order was not a final order from which Mother could have appealed. In light of this conclusion, we direct that Father's fifth issue is without merit.

We now turn to Mother's present appeal from the order entered on September 1, 2020. Mother's brief lists the following four issues for our review:

1) Did the trial court err as a matter of law or abuse its discretion in discounting the [C]hild's claims of sexual and physical abuse by his [F]ather?

2) Did the trial court err as a matter of law or abuse its discretion in its analysis and interpretation of the best interest factors set forth in 23 Pa.C.S. § 5328?

3) Did the trial court err as a matter of law and abuse its discretion in entering multiple gag orders against [Mother]?

4) Did the trial court err as matter of law and abuse its discretion in finding [Mother] in contempt?

Mother's brief at 12-13.

We address Mother's claims mindful of our well-settled standard of review:

> In reviewing a custody order, our scope is of the broadest type and our standard is abuse of discretion. We must accept findings of the trial court that are supported by competent evidence of record, as our role does not include making independent factual determinations. In addition, with regard to issues of credibility and weight of the evidence, we must defer to the presiding trial judge who viewed and assessed the witnesses first-hand. However, we are not bound by the trial court's deductions or inferences from its factual findings. Ultimately, the test is whether the trial court's conclusions are unreasonable as shown by the evidence of record. We may reject the conclusions of the trial court only if they involve an error of law, or are unreasonable in light of the sustainable findings of the trial court.

**V.B. v. J.E.B.**, 55 A.3d 1193, 1197 (Pa. Super. 2012) (citations omitted).

Furthermore, we note that:

- 14 -

> The discretion that a trial court employs in custody matters should be accorded the utmost respect, given the special nature of the proceeding and the lasting impact the result will have on the lives of the parties concerned. Indeed, the knowledge gained by a trial court in observing witnesses in a custody proceeding cannot adequately be imparted to an appellate court by a printed record.

*Ketterer v. Seifert*, 902 A.2d 533, 540 (Pa. Super. 2006) (quoting *Jackson v. Beck*, 858 A.2d 1250, 1254 (Pa. Super. 2004)).

*A.H. v. C.M.*, 58 A.3d 823, 825 (Pa. Super. 2012). Moreover, "[w]hen a trial court orders a form of custody, the best interest of the child is paramount." *S.W.D. v. S.A.R.*, 96 A.3d 396, 400 (Pa. Super. 2014) (citation omitted).

We now turn to Mother's first issue that centers on the court's finding that Father did not sexually abuse Child. Essentially, Mother claims that the trial court did not properly assess the evidence presented and, therefore, could not have arrived at the conclusion that Father should have primary physical custody of Child. Mother identifies testimony relating to the investigation in Virginia, Child's lack of disclosure during his stay at Western Psychiatric Hospital, and his disclosure of abuse only during his second session with Dr. Shienvold as insufficient to support a claim that Child was not abused by Father. She also contends that no evidence supported a finding that she and Mr. Confer influenced Child to accuse Father of abuse.

Much of what Mother refers to is set forth in a manner that is most favorable to her position. However, based on our review of the record, we conclude that the trial court considered all relevant factors. We also note that

its findings are supported by the record. Mother is basically requesting that we reject the trial court's findings and credibility determinations and accept the findings she proposes. We cannot do so. Rather,

> [w]e must accept findings of the trial court that are supported by competent evidence of record, as our role does not include making independent factual determinations. In addition, with regard to issues of credibility and weight of the evidence, we must defer to the presiding trial judge who viewed and assessed the witnesses first-hand.

*J.R.M. v. J.E.A.*, 33 A.3d 647, 650 (Pa. Super. 2011). Recognizing that this must have been a difficult decision for the trial court, we are compelled to examine "whether the trial court's conclusions are unreasonable as shown by the evidence of record." *E.D. v. M.P.*, 33 A.3d 73, 76 (Pa. Super. 2011). Because we do not determine that the trial court's conclusions are unreasonable in light of the sustainable findings, which are based upon the evidence presented, we conclude that the trial court decision is not in error. Mother has not convinced us otherwise.

Mother's second issue is directed at the trial court's findings and conclusions as to the various custody factors that the court determined favored Father, namely factor (4), stability and continuity, and factor (13), party cooperation. Mother also relies on factor (7), child preference.

Concerning factor (4), Mother contends that although she has been Child's primary caregiver and that they have lived in Blair County since Child was 16 months old, the court found this factor to "strongly favor Father" regardless of the fact that Child would be torn "away from the only life he has

ever known to place him in the primary care of a man he fears and who is not available for approximately 10 days each month." Mother's brief at 28.

As for factor (13), it centers on the level of conflict between the parties and also states that "[a] party's effort to protect a child from abuse by another party is not evidence of unwillingness or inability to cooperate with that party." 23 Pa.C.S. § 5328(a)(13). Essentially, Mother contends that "[t]he trial court's use of this factor against [Mother] is emblematic of the impossible situation in which she has been placed, where her support of [Child] is characterized as 'undermining' and she is punished for [Child's] failure to recant his allegations against [Father]." Mother's brief at 29.

With regard to factor (7), the court states that Child has a strong preference to remain with Mother. Mother argues that Child has been placed "in an impossible situation where no matter what he does or says, [Child's] father (and identified abuser) is favored, and the result is being ripped away from his teenage life and sent to live with his father in Virginia." *Id.* at 31. Lastly, Mother argues that the court's reliance on the filing of the federal lawsuit should not have been used to punish her, especially because she ensured that the lawsuit was dismissed prior to the last hearing.

In response, Father asserts that the trial court properly considered all 16 factors and determined that Father should have primary custody of Child. Father claims that this decision rested on the court's credibility decisions and its recognition "that Mother would not encourage or promote continuing

contact with [] Father[, which] is overwhelmingly supported by the evidence." Father's brief at 31. Specifically, Father cites to evidence supporting this assertion, namely, Mother's actions involving the experience at the reunification camp and her text messages to Child's friends' parents in which she called Father a pedophile. Father also cites the filing of the federal lawsuit that claimed Father sexually abused Child. The filing occurred shortly before Child was to live with Father for the summer and was withdrawn around the time of the July 31, 2020 hearing, a fact that Mother acknowledges. *See* Mother's brief at 32. Additionally, Father states that Child informed him that the lawsuit would be dismissed if Father allowed Child to live with Mother. Also, in response to Mother's allegation relating to the safety of Child when in Father's custody, Father cites to Dr. Farber's testimony in which the doctor concluded that he had no safety concerns. Lastly, Father mentions Mother's argument that the court did not give proper weight to Child's preference. Father relies on Dr. Shienvold's report and testimony that supported a finding of undue influence by Mother and that Mother's and Child's relationship was unhealthy. Moreover, the court spoke directly with Child and found him not to be credible.

Again, this issue revolves around the trial court's assignment of credibility and weight of the evidence. Mother's arguments center on her contention that many of the section 5328(a) factors should favor her, which is contrary to the trial court's findings and conclusions. However, based upon

our review of the record, we conclude that the trial court considered all relevant factors. We also conclude that the findings are supported by the record. As in her first issue, Mother is asking this Court to reject the trial court's findings and conclusions and adopt the findings and conclusions she asserts. As before, we cannot do this, because "we must defer to the presiding trial judge who viewed and assessed the witnesses first-hand." **J.R.M.**, 33 A.3d at 650. We also recognize that the trial court's conclusions are reasonable and based upon the evidence presented. Therefore, Mother is not entitled to any relief.

Mother's third issue relates to what Mother refers to as "gag orders" entered by the trial court on November 8, 2018, August 1, 2019, and December 16, 2019. These orders directed Mother to remove from any social media accounts allegations that Father may have sexually abused Child. In fact, the December 16th order found Mother in contempt for not complying with the earlier orders. The December 16th order also stated that "[t]he [c]ourt reaffirms its prior order that neither party may discuss this case in any manner whatsoever, [whether] through any form of online communication, documentary, social media or participate in any effort that could be considered relevant to this specific case. In any event, [Child's] name shall never be used." Order, 12/16/2019. Specifically, Mother contends that these orders are unconstitutional under the First Amendment, which does not allow

"governmental control over the content of messages expressed by private individuals." Mother's brief at 34.

The most recent decision by our Supreme Court involving the issue now before us is **S.B. v. S.S.**, 243 A.3d 90 (Pa. 2020), which provides the basis for our determination of Mother's third issue. We note that Mother relies on numerous decisions from other jurisdictions, which we are not compelled to follow. Moreover, the Pennsylvania decisions Mother relies on were not as recently decided as our Supreme Court's opinion in **S.B.**, which guides our decision particularly because the facts are similar. As in the instant case, the **S.B.** matter concerned a custody proceeding in which the father sought relief from the court by requesting that the mother be prohibited from speaking publicly about the custody case, which involved allegations of sexual abuse by the father. The case also involved the mother's actions of alienating the child from the father and other family members. The trial court issued a "gag order" from which the mother appealed. Extensive litigation ensued, eventually reaching our Supreme Court, whose decision provides the following:

> As [the a]ppellants challenge the gag order on the ground that it violates the right to free speech as guaranteed by the state and federal constitutions, their appeal presents questions of law for which our standard of review is *de novo* and our scope of review is plenary. **Commonwealth v. Davis**, 220 A.3d 534, 540 (Pa. 2019). In conducting our inquiry, we acknowledge that "in cases raising First Amendment issues . . . an appellate court has an obligation to 'make an independent examination of the whole record' in order to make sure that 'the judgment does not constitute a forbidden intrusion on the field of free expression.'" **Gentile v. State Bar of Nevada**, 501 U.S. 1030, 1038, 111 S. Ct. 2720, 115 L. Ed. 2d 888 (1991) (internal citation omitted).

- 20 -

*S.B.*, 243 A.3d at 104.  The opinion further states that:

> It is beyond cavil that our political and cultural lives rest upon the principle, guaranteed by the First Amendment, "that each person should decide for him or herself the ideas and beliefs deserving of expression, consideration, and adherence." *Turner Broad. Sys. v. FCC*, 512 U.S. [622, 641 (1994)].  Accordingly, the First Amendment precludes the government from restricting expression due to its message, ideas, subject matter, or content.  *Police Dept. of Chicago v. Mosley*, 408 U.S. 92, 95, 92 S. Ct. 2286, 33 L. Ed. 2d 212 (1972).  One's constitutional right to free speech, however, while fundamental, is not absolute.  *Neb. Press Ass'n[ v. Stuart]*, 427 U.S. [539, 570 (1976)].  Freedom of speech "does not comprehend the right to speak on any subject at any time." *American Communications Assn. v. Douds*, 339 U.S. 382, 394, 70 S. Ct. 674, 94 L. Ed. 925 (1950).  Instead, First Amendment freedoms must be "applied in light of the special characteristics of the [relevant] environment."  *Tinker v. Des Moines Indep. Community Sch. Dist.*, 393 U.S. 503, 506, 89 S. Ct. 733, 21 L. Ed. 2d 731 (1969).

*S.B.*, 243 A.3d at 104.

Additionally, the *S.B.* decision provides an extensive discussion of the nature of the speech restrictions and concludes that the "gag order" allowed the mother to disseminate her thoughts and opinions regarding issues such as "parental alienation, child sexual abuse, and placement of children in the custody of sexually abusive parents, and to testify about these issues before governmental bodies in an effort to remedy these vital societal concerns." *Id.* at 107.  However, the limitation on the mother's speech "lies in the manner of communications, as [she is] precluded from conveying such public speech in a way that exposes [the child's] identity and subjects him to harm." *Id.* The *S.B.* decision further states that "a restriction on the manner of parental

speech in a custody case furthers an important governmental interest where there is a substantial likelihood that the restrained speech has harmed or will imminently harm the child." *Id.* at 110. Thus, based upon our review of the record before us, we conclude that the "gag orders," *i.e.*, the speech restrictions, are justified to protect the psychological and emotional well-being of Child in this case and do not violate the First Amendment.

Mother's last issue is directed at the trial court's order dated December 16, 2019, and entered on December 20, 2019, in which she was found in contempt for violating its prior order that prohibited Mother from discussing her allegations of sexual abuse of Child by Father. In response to this issue, Father claims that contempt orders are final orders subject to immediate review. In other words, Father asserts that Mother should have appealed the contempt order within thirty days of its issuance on December 20, 2019.

We agree. "[I]t is beyond cavil that a finding of contempt is final and appealable…." *J.M. v. R.W.*, 164 A.3d 1260, 1264 (Pa. Super. 2017) (citing *Stahl v. Redcay*, 897 A.2d 478 (Pa. Super. 2006)). *See also* Pa.R.A.P. 903(a) ("[T]he notice of appeal … shall be filed within 30 days after the entry of the order from which the appeal is taken."). The record here reveals that Mother did not file an appeal within thirty days of the December 16, 2019 contempt order. Rather, she is raising the question of the contempt order in the present appeal, which was filed after the issuance of the August 26, 2020 custody order, which was entered on September 1, 2020. Therefore, we are

compelled to quash this portion of Mother's appeal, as we do not have jurisdiction to address Mother's contempt claim.

Thus, we affirm the trial court's custody order.

Motion to quash dismissed.  Order affirmed.

Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary

Date:  6/9/2021